204 P.3d 484

**STATE of Hawai'i, Respondent/Plaintiff–Appellant,**

v.

**Marshall HINTON, Petitioner/Defendant–Appellee.**

No. 27719.

Supreme Court of Hawai'i.

March 19, 2009.

7

0

Karen T. Nakasone, Deputy Public Defender, for petitioner/defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge BLONDIN, Assigned by Reason of Vacancy.

Opinion of the Court by MOON, C.J.

On January 29, 2009, this court accepted a timely application for a writ of certiorari, filed on December 17, 2008 by petitioner/defendant-appellee Marshall Hinton, seeking review of the Intermediate Court of Appeals' (ICA) September 18, 2008 judgment on appeal, entered pursuant to its August 26, 2008 summary disposition order (SDO), 118 Hawai'i 419, 191 P.3d 1096, 2008 WL 3907396. Therein, the ICA vacated the Circuit Court of the First Circuit's[1] December 21, 2005 findings of fact (FOFs), conclusions of law (COLs), and order granting Hinton's motion to dismiss the indictment with prejudice. Oral argument was held on February 19, 2009.

Briefly stated, Hinton was indicted for allegedly touching the then-thirteen-year-old complainant [hereinafter, the complainant] on her genital area outside her clothing and was subsequently tried by a jury for sexual assault in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(b) (Supp.2008).[2] However, the trial court declared a mistrial after the jury was unable to reach a unanimous verdict and, upon motion by Hinton, dismissed the indictment with prejudice, pursuant to *State v. Moriwake*, 65 Haw. 47, 647 P.2d 705 (1982), discussed *infra.* On appeal by respondent/plaintiff-appellant State of Hawai'i (the prosecution), a majority of the ICA concluded that the trial court abused its discretion in dismissing the indictment and, accordingly, vacated the trial court's dismissal. Judge Foley dissented, concluding that the "[trial] court did not abuse its discretion in dismissing the indictment against Hinton."

Hinton argues on application that "the ICA gravely erred in concluding that the trial court abused its discretion in dismissing the case under *Moriwake* " inasmuch as the ICA "improperly incorporated [a] novel 'separation of powers' consideration" into its analysis that "conflict[s] with *Moriwake* and its progeny." Based on the discussion below, we hold that the ICA erred in (1) injecting an additional "separation of powers" analysis into the *Moriwake* framework and (2) holding that the trial court abused its discretion in dismissing the indictment with prejudice. Accordingly, we reverse the ICA's judgment on appeal and affirm the trial court's December 21, 2005 FOFs, COLs, and order granting Hinton's motion to dismiss the indictment with prejudice.

## I. BACKGROUND

### A. Relationship Between Hinton and the Complainant

Hinton and the complainant's grandmother, Karen Dupont, were involved in a romantic relationship for approximately twenty-seven years and, during that time, had two children together. Hinton and Dupont's relationship began when the complainant's mother, Jeminis Dupont (Jeminis), was two-

---

1. The Honorable Richard K. Perkins presided over the underlying proceedings.

2. HRS § 707–732(1)(b) provides: "A person commits the offense of sexual assault in the third degree if ... [t]he person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]"

years-old, and, although Hinton was not her biological father, Jeminis referred to him as "Dad." Likewise, the complainant referred to Hinton as "Papa."

At the time of the alleged assault, Hinton and Dupont were no longer in a romantic relationship; however, they apparently remained friends. Hinton often spent time at Dupont's residence, visiting his biological children and working on cars that he kept there. Dupont estimated that Hinton spent "a couple hours" two or three days a week at her house.

### B. *Indictment and Trial*

On December 23, 2004, Hinton was indicted with one count of sexual assault in the third degree, in violation of HRS § 707–732(1)(b), for allegedly placing his hand on the complainant's genital area outside her clothes. A two-day jury trial was held on September 12 and 13, 2005.

The prosecution's main witness at trial—the complainant—testified that, on December 7, 2004, she came home from school to Dupont's house in Salt Lake, where the complainant was residing with her mother, Jeminis, and other family members.[3] Upon arriving at the house, the complainant saw Hinton and Dupont outside the house. On direct examination the complainant testified as follows:

A [By the complainant] [Hinton] told me to come behind the truck. And then he showed me the porno magazine.

Q [By the prosecution] Now, how did you know it was a porno magazine?

A 'Cause there were naked people on the cover.

Q Now, who was holding this magazine?

A [Hinton].

Q How long do you think that he was holding it in front of you?

A About five seconds.

Q Okay. How did looking at this magazine make you feel?

A Awkward.

Q Now, what did you do to the magazine when [Hinton] tried to show it to you?

A I looked away.

Q What did you do after he showed you the magazine?

A I went into the house.

The complainant further testified that Hinton then followed her into the house and told her to sit down next to him on the couch in the living room. The complainant indicated that she and Hinton were sitting "close" to one another so that they were touching. When asked, "what happened after [she] sat down next to [Hinton]," the complainant testified that:

A [By the complainant] [Hinton] grabbed my hand.

Q [By the prosecution] And what hand—which of your hands did he grab?

A The left.

Q And which one of his hands did he grab your hand with?

A The right.

Q Okay. And how was he holding your hand?

A Like criss-cross.

[PROSECUTING ATTORNEY]: Your honor, may the record reflect the witness is showing intertwined fingers?

THE COURT: Yes.

[PROSECUTING ATTORNEY]: Thank you.

By [the prosecution]:

Q Now, where did [Hinton] put your hands at first?

A On his lap.

Q Okay. And where exactly on his lap?

A Like by his knee.

Q Did he move your hands?

A Yes.

Q And where did he move your hands?

A To my nani area.

---

3. At the time of the alleged assault, the complainant had only been residing at the Dupont house for about six months-since July 2004. For the four years prior to moving to the Dupont house, the complainant had been living in New Jersey with a family member because of her mother's drug use.

Q Do you have any other words for your nani?

A Private part.

Q Okay. What part of his body touched your nani?

A His hand.

Q Do you know how long his hand was on your nani?

A Three seconds.

Q Did he move his hand at all while it was on your nani?

A Yes.

Q What direction did he move his hand?

A Up and down.

Q Were you wearing clothes at the time?

A Yes.

Q Okay. And was this under your clothes or over your clothes?

A Over.

Q What happened after [Hinton] touched your nani?

A I let go of his hand and went into the kitchen.

Q How did you feel at this time?

A Weird.

Q Did—did [Hinton] follow you into the kitchen?

A Yes.

Q Did he say anything to you at this time?

A He wanted me to flash my boobs.

Q Okay. How do you know that?

A He did hand motion.

Q Okay. And could you describe what you mean by hand motion?

A He went up like that.

[PROSECUTING ATTORNEY]: Your Honor, may the record reflect that the witness has shown two fists from a lower position to a higher position?

By [the prosecution]:

Q So what did you think he wanted you to do?

A Flash.

Q Okay. And what do you mean by flash?

A Lift up my shirt.

Q Okay. And did you do that?

A No.

The complainant testified that Dupont then entered the kitchen area, but that she (the complainant) did not immediately say anything or tell anyone (including her mother or grandmother) about what happened. About a week later, the complainant told her mother's friend, "Aunty Kelly," about the alleged December 7, 2004 assault.

The complainant also testified that, on December 19, 2004 while riding in Hinton's vehicle, Hinton made her watch a DVD of "[p]eople having sex." She later reported the incident to her family members, and the police were called that evening. The police searched Hinton's vehicle and recovered a DVD player, but no pornographic DVD was found. Although the December 19 incident did not give rise to criminal charges, the December 7 alleged incident, which was also reported to the police at that time, led to the instant case.

Dupont also testified for the prosecution. In her testimony, she indicated that, on December 7, 2004, she "walked in the house and [Hinton and the complainant] were sitting on the couch talking, and [the complainant] was smiling and laughing." Dupont indicated that she believed the complainant was smiling " 'cause [Hinton] was explaining to her about getting her a cell phone for her for Christmas, and gifts, Christmas gifts." Dupont also indicated that, after the alleged December 7 incident was reported to the police on December 19, 2004, she and Hinton asked Jeminis and the complainant to move out of the Dupont house. However, on cross-examination, Dupont stated that, prior to the alleged incident being reported to the police, she and Hinton spoke with Jeminis and the complainant about leaving the home. Dupont indicated that both Jeminis and the complainant were very upset that Dupont was kicking them out.[4]

---

4. It was Hinton's theory at trial that the complainant made the allegations of abuse because she was angry about Hinton and Dupont telling her and her mother to move out.

Aunty Kelly and Jeminis, among others, also testified for the prosecution, essentially confirming the complainant's testimony that she told Aunty Kelly about the alleged December 7, 2004 assault. Additionally, on cross-examination, Jeminis admitted to methamphetamine use at or around the time of the alleged incident. At the close of the prosecution's case-in-chief, Hinton moved for a judgment of acquittal, which was denied by the trial court.

Hinton—the only witness called by the defense-testified on his own behalf and denied that he touched the complainant on her genital area on December 7, 2004 or that he asked her to flash him on that same day. Hinton testified as follows regarding the events that allegedly occurred on December 7:

Well, I was working on a car at the time. And [the complainant] came up and she said, Hi, papa. And then her grandmother, [Dupont], went down to ask her why was she late coming home from school. As far as her explanation I don't really know.

... I continued to work on the car. And after a while I was hot outside, so I went in the house to use the bathroom, I don't know whether [the complainant] was on the couch or in the kitchen, but my daughter ... was in the room. So I went to use the bathroom. And when I came back out, [the complainant] was asking me about a cell phone that we were supposed to get her for Christmas[.]

... About that time, we was in the middle of a conversation and my cell phone ring, and was [Hinton's girlfriend]. The birds was chirping and I could barely hear what she was saying. I was like, hello. And so I went to—headed towards the door.... And [the complainant] grabbed me by the hand and was pulling me back because she wanted to continue the conversation about the telephone. So I was talking to my girlfriend, and my phone began to go dead. So what I did was I told her I would call her back. After that I hung up

the phone. And [the complainant] was pulling me by my hand, so I turned. Constantly talking to her about the phone.

... Shortly after that, [Dupont] walks in, and I ask her to get her house phone to call up [Hinton's girlfriend]. And then shortly after that, she went and got the phone and brought it back out to me[.]

... I get the phone and I step outside to call my girlfriend. [5]

The case was submitted to the jury on the afternoon of September 13, 2005. On September 14, 2005, the jury sent a communication (Communication No. 1) to the trial court, asking, "[w]hat is the definition of the genitailia [sic] areas? Is the back of the hand on pubic hair considered touching the genitailia [sic] area[?]" The trial court—upon consultation with counsel—responded:

As to your first question, the term "genitalia" is to be understood in its common or usual use or meaning.

As to your second question, this is for you to determine based on the instructions you already have.

A few hours later, the jury sent another communication (Communication No. 2), indicating that the jury was "deadlocked," and asking "what should [it] do?" In response, the trial court sent a question to the jury, asking: "Would further deliberation of any length be reasonably likely to result in a unanimous verdict?" The jury indicated "no" and submitted a note that stated, "[w]ith copies of police reports, written statements of wittnesses [sic] and transcripts, we might be able to reach a unanimous verdict. Otherwise no." On September 15, 2005, the jury sent Communication No. 3 to the trial court, requesting to hear the testimony of a number of witnesses, including the complainant and Hinton. The trial court declined the jury's request. Thereafter, the jury sent Communication No. 4, stating that "[t]he jury cannot reach a unanimous verdict." The trial court determined that the jury was hopelessly deadlocked and declared a mistrial.[6]

---

5. Hinton also denied the allegations that he showed the complainant a pornographic video in his vehicle on the evening of December 19, 2004.

6. We note that both trial counsel met with the jurors after they were dismissed and learned that the vote was eight for acquittal and four guilty.

On October 5, 2005, Hinton filed a motion to dismiss the indictment with prejudice, pursuant to *Moriwake,* discussed *infra.* The prosecution opposed Hinton's motion to dismiss. A hearing was held on October 12, 2005, and, subsequent to hearing arguments by the parties, the trial court orally granted Hinton's motion to dismiss the indictment with prejudice. Specifically, the trial court reasoned that:

[U]nder *Moriwake,* when faced with a motion to dismiss such as the one that has been filed in this case, [the trial court] must look to a number of factors. The first is the severity of the offense charged. Now, this is a class C felony. It is the least serious felony class—or it is within the least serious felony class. I'm not minimizing the offense itself, but it is the lowest level felony. And that, to me, weighs against retrial. We've got A's and B's to deal with. And there are no special circumstances here in terms of injury. There's nothing that I saw, no physical harm to the complainant. So I think looking at the offense itself and the classifications the legislature has given it, that one weighs against retrial.

The second *Moriwake* factor concerns the number of prior mistrials and the circumstances of the jury deliberation therein so far as is known. Well, we have only one mistrial. Chief Justice Richardson, in a footnote, seems to say usually after a second hung jury mistrial, it's probably a good idea to think seriously about dismissing a case. That sort of suggests that doing it after one mistrial or doing it—or allowing a trial after two hung juries is probably less—well, more unusual. But still, let me look at the circumstances of the deliberations.

I don't know who put it in the moving papers, but somebody said it was eight to four for acquittal. It's not so much in the numbers. And there is an indication that at least two people were going back and forth so it could have been 50/50 at one point in time. And in my judgment, that's more significant, the fact that they were evenly split, than where it ended up at eight to four for acquittal. The jury did seem to have problems following the evidence, but they were allowed to take notes. I'm not sure I saw many of them taking a lot of notes during the course of the trial. But all in all, the questions they asked and their trouble following the evidence makes me feel that this factor weighs in favor of a retrial.

The next *Moriwake* factor is the character of prior trials in terms of length, complexity, and similarity of evidence presented. Well, we've only had one prior trial. It wasn't very long. So I think that kind of weighs in favor of retrial. It was not complex. In my judgment, it was not a complicated trial. The key issue was credibility. It was [Hinton]'s credibility versus [the complainant] and her mother pretty much. So to me, that factor weighs against retrial.

Now, the next factor is the similarity of evidence, and this looks back at the prior trials. We've only got one trial so we're not talking about similarity so I'm going to skip that one. I don't think it applies to our case.

The next factor is the likelihood of any substantial difference in a subsequent trial if allowed. And that one, to me, is important. [The prosecution] argues the phone records, videotape, [7] and ... clarifying the term genitalia. The phone records—well, let me say this much. A new trial is not to correct mistakes that were made in the first trial because that impacts the fairness factor. So I tend to discount that. The video and the [prosecution] being able to call [a witness] next time around, I think I have to discount as well because I don't think [Hinton's counsel] would get into

---

7. We note that the trial court's reference to "the videotape" is not the one related to the December 19, 2004 incident, but a different "pornographic" tape. Specifically, the complainant testified at trial that, prior to the alleged December 7, 2004 incident, Hinton had used her camcorder and made a recording "of him playing with himself," which video he left in the complainant's camcorder. However, this videotape was never recovered by the police or the prosecution. Indeed, at oral argument, the prosecution conceded that the subject videotape was not in their possession and, thus, it would not be likely for it to be introduced at a subsequent trial.

that area again, and it is not independently admissible as far as I can see.

And, you know, the clarification of the term genitalia is—I don't know what else to do. Most people know what that is. And if they didn't, they could have asked us for a definition. But when we responded that that word was to be taken in its ordinary common meaning, we didn't get anymore questions in that area. I think they were more concerned with whether just touching—I think there was a reference to pubic hair—was enough. To me, they were looking at how serious the offense was rather than any confusion with regard to what genitalia means.

I think all of these things considered that in the next trial, the evidence would be substantially similar. It would not differ all that much. So that one, that factor, weighs against retrial.

On the [trial] court's evaluation of the evidence, I think—and this is the [trial] court's personal view—it weighs in favor of retrial. But this factor should be, I think, discounted in view of the [supreme] court's opinion in *State v. Lincoln* [, 72 Haw. 480, 825 P.2d 64 (1992) ]. I don't think the [trial] court's view of the evidence should determine whether there's a retrial or not. It can come into balance, but I don't think the court should place too much weight on that.

And the final factor is the professional conduct and diligence of the respective counsel, particularly that of the prosecuting attorney. You know I don't have—I think both of you did a good job in this case. I think, as both of you seem to be saying, that the professional conduct and diligence of counsel was fine, was adequate, appropriate, et cetera. And I agree. And I think given that, that factor weighs against retrial.

You know, so *I've looked at all these things, and I haven't given—well, I have to say it is a close case. But all things considered, I think more of the factors weigh against a retrial.* And so I'm going to grant the motion to dismiss.

(Emphasis added.)

On December 21, 2005, the trial court entered its FOFs, COLs, and an order, consis-tent with its oral ruling, granting Hinton's motion to dismiss the indictment with prejudice. Of particular relevance are the trial court's COLs, which stated:

1. The trial court has the inherent discretionary ability to dismiss an indictment with prejudice after balancing the "interest of the state against fundamental fairness to a defendant as well as the orderly functioning of the court system."

2. In balancing these interest[s] the [trial] court shall consider the following factors: (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberations therein, so far as is known; (3) the character of prior trials in terms of length, complexity[,] and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney.

3. As to the severity of the offense charged, character of the trial, likelihood of any substantial difference in a subsequent trial, and the professional conduct and diligence of counsel, the [trial] court finds [sic] that these factors weigh against retrial.

4. Consequently, the [trial] court finds [sic] that in balancing all of the aforementioned [sic] factors, the interest[s] of the state do not outweigh the fundamental fairness to a defendant as well as the orderly functioning of the court system.

On January 20, 2006, the prosecution filed a timely notice of appeal.

### C. *Appeal Before the ICA*

On direct appeal, the prosecution argued that "the trial court clearly abused its discretion in granting [Hinton]'s motion to dismiss the indictement [sic] with prejudice" inasmuch as the trial court's COLs were "wrong" and its FOFs "in support thereof [were] clearly erroneous." In response, Hinton contended that the trial court did not abuse its discretion in dismissing the indictment with prejudice.

On August 26, 2008, the ICA issued an SDO, vacating the trial court's December 21, 2005 FOF's, COLs, and order granting Hinton's motion to dismiss the indictment with prejudice, and remanded the case for further proceedings. SDO, 2008 WL 3907396, *4. As discussed more fully *infra,* the ICA, citing to *State v. Lincoln,* 72 Haw. 480, 491, 825 P.2d 64, 70 (1992), and two out-of-state cases, expressed concern that the trial court's dismissal of the indictment with prejudice raised "separation-of-powers concerns." *Id.* at *2. In that light, the ICA examined the six *Moriwake* factors and determined that—contrary to the trial court's conclusion—such factors "weigh[ed] strongly in favor of a retrial" and that, therefore, the trial court abused its discretion in dismissing the indictment with prejudice. *Id.* Judge Foley issued a dissent, indicating that, contrary to the majority's view, "[t]he [trial] court did not exceed the bounds of reason or disregard rules or principles of law or practice, and, therefore, the [trial] court did not abuse its discretion in dismissing the indictment against Hinton." *Id.* at *4 (Foley, J., dissenting) (footnote omitted). Additionally, Judge Foley noted that he "believe[d] that the majority's 'separation of powers concerns' [were] unwarranted." *Id.* at *5 n. 1.

The ICA's judgment on appeal was issued on September 18, 2008. Thereafter, on January 29, 2009, this court accepted Hinton's application and heard oral argument on February 19, 2009.

## II. STANDARD OF REVIEW

"A [trial] court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion." *State v. Akau,* 118 Hawai'i 44, 51, 185 P.3d 229, 236 (2008) (citation omitted).

> The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it.

*State v. Wong,* 97 Hawai'i 512, 517, 40 P.3d 914, 919 (2002) (citation omitted).

## III. DISCUSSION

As previously stated, Hinton's assignment of error is grounded in his contention that the ICA "improperly incorporated [a] novel 'separation of powers' consideration" into its analysis which "conflict[s] with *Moriwake* and its progeny" and, therefore, "failed to properly apply the abuse of discretion standard of review." More specifically, Hinton argues that the ICA's citation to *Lincoln* "as a segway to import a novel 'separation of powers' factor from out-of-state cases, into Hawaii's established *Moriwake* analysis[,]" erodes the inherent constitutional power of the trial court and disregards *Moriwake.*

### A. The Relevant Case Law

#### 1. Moriwake

In *Moriwake,* this court was faced with, *inter alia,* the issue "whether an indictment for manslaughter was properly dismissed with prejudice following two hung jury mistrials on the charge [of manslaughter]." 65 Haw. at 48, 647 P.2d at 708. During the first trial, which lasted three days, the defendant argued that he did not have the requisite state of mind to commit the crime due to extreme intoxication. *Id.* at 49, 647 P.2d at 708. Following approximately ten hours of deliberations, the jury informed the trial court that it could not reach a verdict, and the trial court, after questioning the jurors, "concluded that the jury was at an impasse and declared a mistrial *sua sponte.*" *Id.* Three months later, a second trial was conducted on the same charge. *Id.* Again, the jury could not reach a verdict, and the trial court declared a second mistrial. *Id.* Thereafter, the trial court—upon motion by the defendant—dismissed the indictment, reasoning, *inter alia,* that, "under the circumstances of this case, a third trial would pose an undue emotional, personal[,] and financial hardship on the defendant." *Id.* at 50, 647 P.2d at 708. The prosecution appealed the trial court's dismissal. *Id.* at 50, 647 P.2d at 709.

On appeal, this court, recognizing the "inherent or implied powers of the court," *id.* at 55, 647 P.2d at 712, stated that "the inherent power of the court is the power to protect

itself; the power to administer justice whether any previous form of remedy has been granted or not; the power to promulgate rules for its practice; and the power to provide process where none exists." *Id.* (quoting *In re Bruen,* 102 Wash. 472, 172 P. 1152, 1153 (1918)) (internal quotation marks and footnote omitted). This court further stated that the *"aspect of the judicial power which seeks to 'administer justice' is properly invoked when a trial court sua sponte dismisses an indictment with prejudice following the declaration of one or more mistrials because of genuinely deadlocked juries,* even though the defendant's constitutional rights are not yet implicated." *Id.* (emphasis added) (footnote omitted). The *Moriwake* court also recognized that:

> Society has a strong interest in punishing criminal conduct. But society also has an interest in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings. Where those fundamental interests are threatened, the *"discretion"* of the prosecutor must be subject to the power and responsibility of the court.

*Id.* at 56, 647 P.2d at 712 (quoting *State v. Braunsdorf,* 98 Wis.2d 569, 297 N.W.2d 808, 817 (1980) (Day, J., dissenting)) (emphasis added) (format altered). "Simply put," the *Moriwake* court stated, *"it is a matter of balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system."* *Id.* (emphasis added) (citation, internal quotation marks, and original brackets omitted). Based on the foregoing, the *Moriwake* court laid out the following six factors, "which the trial court should consider in undertaking [the aforementioned] balance," *id.* at 56, 647 P.2d at 712:

> (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberations therein, so far as is known; (3) the character of prior trials in terms of length, complexity[,] and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective coun-

sel, particularly that of the prosecuting attorney.

*Id.* at 56, 647 P.2d at 712–13 (citation omitted). Applying the six factors to the case before it, the *Moriwake* court held that it did "not perceive the trial court to have abused its discretion in dismissing the indictment[.]" *Id.* at 57, 647 P.2d at 713.

## 2. *Lincoln*

*Lincoln,* like *Moriwake,* involved an appeal from the dismissal of an indictment; however, the procedural history of *Lincoln* differs from that of *Moriwake.* The defendant in *Lincoln* was initially charged with and tried on two counts of "murder for hire" and one count of "attempted murder for hire." 72 Haw. at 482, 825 P.2d at 66. The jury convicted the defendant of all three charges, but failed to find that the defendant perpetrated the crimes "for hire" as was required by the statute. *Id.* On appeal, the ICA determined that such failure was harmless and affirmed the defendant's convictions. *Id.* at 482–83, 825 P.2d at 66. However, the federal courts (the United States District Court for the District of Hawai'i and the United States Court of Appeals for the Ninth Circuit) thereafter granted the defendant's petition for habeas corpus and required that he be retried. *Id.* at 483, 825 P.2d at 66–67. On retrial, the defendant was convicted of only one of the charges. *Id.* at 483, 825 P.2d at 67. On appeal to this court, the defendant's conviction was overturned inasmuch as the defendant's confrontation right was violated at trial. *Id.* In overturning the defendant's sole conviction, this court explicitly remanded the case for a new trial. *Id.* Upon remand (during the pretrial phase of the scheduled third trial), the trial court granted the defendant's motion for a judgment of acquittal and/or dismissal of the indictment as to the single murder count. *Id.* at 483–84, 825 P.2d at 67. In so doing, the trial court—citing this court's decision in *Moriwake*—based its ruling on its "inherent ability to dismiss an indictment with prejudice in the administration of justice." *Id.* at 484, 825 P.2d at 67. On appeal, this court reversed the trial court's dismissal of the indictment. *Id.* at

492, 825 P.2d at 71. Looking to the six *Moriwake* factors, the *Lincoln* court stated:

> Except for the "case strength" factor, we find little in the [trial] court's decision to support a dismissal of the indictment. Furthermore, in *Moriwake* as well as in *State v. Alvey*, 67 Haw. 49, 678 P.2d 5 (1984), we cautioned that a trial court's inherent power to dismiss an indictment is not a broad power and that trial courts must recognize and weigh the [prosecution's] interest in prosecuting crime against fundamental fairness to the defendant. In *Moriwake* we said, "we think that the magnitude of the respective interests of society and of criminal defendants which are implicated in this area of the law requires that we more fully delineate the parameters within which this discretion is properly exercised." 65 Haw. at 56, 647 P.2d at 712. In *Alvey* we made clear that, even if "there are serious questions" about a material element of a crime, it is not within the trial court's discretion to usurp the function of the trier of fact before trial. 67 Haw. at 58 n. 6, 678 P.2d at 11 n. 6.
>
> In the instant case, the [trial] court was not confronted with the prospect of a third trial based on evidence which had failed to convict a defendant two previous times. Rather, the trial court faced the prospect of a third trial following two prior convictions, albeit with a lesser quantum of evidence than previously available.... *It is not for the trial court to weigh the evidence in determining whether to proceed to trial.*

*Id.* at 491–92, 825 P.2d at 70–71 (emphases added) (footnote omitted). In other words, this court reasoned that "[i]t is the duty of the trial court, on remand, to comply strictly with the mandate of the appellate court" and "implicit in [this court's] remand was a finding that, on balance, the public's interest and the defendant's interest in fundamental fairness were served by conducting a new trial." *Id.* at 485–86, 825 P.2d at 68.

## B. *The ICA's Analysis*

Although recognizing the six *Moriwake* factors, the ICA reasoned that separation of powers concerns require that the trial court's power to dismiss an indictment be used "only in rare and unusual cases when compelling circumstances require such a result to assure fundamental fairness in the administration of justice." SDO, 2008 WL 3907396, *2 (citations omitted). Specifically, the ICA stated:

> While the dismissal of an indictment after one or more mistrials should be reviewed for abuse of discretion, that discretion is limited in light of the "magnitude of the respective interests of society and of criminal defendants which are implicated in this area of the law[.]" [*Moriwake*, 65 Haw.] at 56, 647 P.2d at 712; *see State v. Lincoln*, 72 Haw. 480, 491, 825 P.2d 64, 70 (1992) (stating that "a trial court's inherent power to dismiss an indictment is not a broad power and that trial courts must recognize and weigh the State's interest in prosecuting crime against fundamental fairness to the defendant"). Indeed, some courts have observed that dismissal of an indictment in these circumstances raises separation-of-powers concerns which require that the power to dismiss be used sparingly:
>
> > [B]ecause of separation-of-powers considerations and the public's interest in the prosecution of those charged with criminal offenses, the trial court's discretion to dismiss cases in the interest of justice is necessarily limited. Generally, trial courts may dismiss prosecutions in furtherance of justice against the wishes of the prosecutor only in rare and unusual cases when compelling circumstances require such a result to assure fundamental fairness in the administration of justice.
>
> *State v. Sauve*, [164 Vt. 134,] 666 A.2d 1164, 1167 (1995) (citations omitted); *State v. Gonzales*, [132 N.M. 420,] 49 P.3d 681, 686 (N.M.Ct.App.2002) ("As long as the court's discretion in dismissing successive prosecutions is limited and exercised with great caution, there is no separation of powers violation.... We ... limit the discretion of trial courts so that they may dismiss criminal prosecutions only in the most extreme of cases.").

SDO at **1–2. In the light of the aforementioned separation of powers principles, the

ICA turned next to analyze each of the six *Moriwake* factors as follows:

| Moriwake Factor | ICA's Analysis |
|---|---|
| 1. Severity of offense charged | The ICA reasoned that "the [prosecution] contended that Hinton was a sexual predator, while the defense portrayed him as an innocent victim. There is a strong societal interest in having a jury resolve that dispute[.]" *Id.* at 8. Thus, contrary to the trial court, the ICA held that "this factor weighs in favor of a retrial." |
| 2. Number of prior mistrials and circumstances of jury deliberations therein, so far as is known | The ICA agreed with the trial court "that the jury had trouble following the evidence" and, accordingly, reasoned that "there [was] a basis for concluding that another jury would be able to reach a verdict." *Id.* at 5. |
| 3. Character of prior trials (length, complexity, & similarity of evidence) | The ICA concluded that the fact that there was "only one prior trial weighs significantly in favor of allowing a retrial." *Id.* at 6-7. |
| 4. Likelihood of any substantial difference in a subsequent trial, if allowed | The ICA did not directly analyze this factor, but stated "it does not appear likely that the [prosecution] will introduce significantly different evidence in another trial." *Id.* at 7. |
| 5. Trial court's own evaluation of the relative case strength | The ICA concluded that the trial court's view that *Lincoln* prevented it from weighing the evidence was erroneous. *Id.* at 5-6. However, the ICA did not present its own view of the relative case strength. |
| 6. Professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney | The ICA did not address this factor. |

In sum, the ICA concluded that:

There are substantial factors here weighing in favor of a retrial: this is a serious offense, there is reason to conclude that another jury could reach a verdict, and the defendant has been subjected to only one trial. There are some factors that weigh against a retrial, such as the fact that it does not appear likely that the [prosecution] will introduce significantly different evidence in another trial. While that is a legitimate consideration, we believe that it must be tempered by the [trial] court's observation that the jury appeared confused by the testimony even though the trial was not particularly complex. Thus, there is a basis for concluding that another jury could reach a verdict even if the evidence is essentially the same. On balance, we believe that the factors identified by *Moriwake* weigh strongly in favor of a retrial, and[,] accordingly, we conclude that the [trial] court abused its discretion in dismissing the indictment.

*Id.* at *4.

In his dissent, Judge Foley reasoned simply that the trial court "applied the *Moriwake* factors ... [,] did not exceed the bounds of reason or disregard rules or principles of law or practice, and, therefore, ... did not abuse its discretion in dismissing the indictment against Hinton." SDO (Foley, J.,

dissenting) at *4. Additionally, Judge Foley noted that, in his view, "the majority's 'separation of powers concerns' [were] unwarranted" inasmuch as:

In *Moriwake*, the Hawai'i Supreme Court stated:

[W]e are cognizant of the deference to be accorded the prosecuting attorney with regard to criminal proceedings, but such deference is not without bounds. As stated elsewhere:

Society has a strong interest in punishing criminal conduct. But society also has an interest in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings. Where those fundamental interests are threatened, the "discretion" of the prosecutor must be subject to the power and responsibility of the court.

[*Moriwake*, 65 Haw.] at 56, 647 P.2d at 712 (quoting *State v. Braunsdorf*, [98 Wis.2d 569,] 297 N.W.2d 808, 817 (Wis.1980) (Day, J., dissenting)).

*Id.* at *5 n. 1.

## C. ICA's "Separation of Powers Concerns"

Preliminarily, we address Hinton's arguments regarding the ICA's "separation of powers concerns." Specifically, Hinton argues that the ICA erred inasmuch as it: (1)

"use[d] dicta from *Lincoln* to begin injecting novel separation of powers considerations into the established *Moriwake* analysis" and, thus, "radical[ly] depart[ed] from *Moriwake* and its progeny"; and (2) "attemp[ed] to elevate the 'wishes of the prosecution' factor within the current *Moriwake* analysis and concomitantly diminish[ed] the trial court's discretion." Additionally, Hinton takes issue with the ICA's use of two out-of-state cases, *Sauve* and *Gonzales,* which he claims "are clearly distinguishable and inapposite."

As previously indicated, the ICA, in its SDO, reasoned that separation of powers concerns require that the power to dismiss be used "only in rare and unusual cases when compelling circumstances require such a result to assure fundamental fairness in the administration of justice." SDO at *2 (citations omitted). However, we believe, as did Judge Foley, that the ICA majority's separation of powers concerns are unwarranted. Indeed, even the prosecution disavowed any reliance on, or applicability of, *Sauve* or *Gonzalez.*

As indicated in Judge Foley's dissent, this court, in *Moriwake,* explicitly stated that it was "cognizant of the deference to be accorded the prosecuting attorney with regard to criminal proceedings." SDO (Foley, J., dissenting) at *5 n. 1 (quoting *Moriwake,* 65 Haw. at 56, 647 P.2d at 712). However, this court also pointed out that "*such deference [was] not without bounds,*" holding that, where society's fundamental interests in protecting the integrity of the judicial process and in ensuring fairness to defendants in judicial proceedings are threatened, "*the 'discretion' of the prosecut[ion] must be subject to the power and responsibility of the court.*" *Moriwake,* 65 Haw. at 56, 647 P.2d at 712 (emphasis added) (citation omitted). Nowhere in its opinion did the *Moriwake* court "limit the discretion of trial courts so that they may dismiss criminal prosecutions only in the most extreme cases." SDO at *2 (citation and internal quotation marks omit-

ted). Indeed, as observed by then-ICA Judge Acoba:

[This court's] recognition of the trial court's inherent power to dismiss an indictment with prejudice [in *Moriwake* ] and its adoption of a standard from the dissenting opinion of *State v. Braunsdorf,* [98 Wis.2d 569,] 297 N.W.2d 808 (Wis.1980), implicitly rejected the majority's holding in that case. *Braunsdorf* involved the prosecution's motion to dismiss a charge of welfare fraud without prejudice since it was not ready to proceed to trial. The trial court granted the motion, but dismissed it with prejudice. *Id.* at 810. The majority[ ] held that[ ] "trial courts of this state do not possess the power to dismiss a criminal case with prejudice prior to the attachment of jeopardy except in the case of a violation of a constitutional right to a speedy trial." *Id.* at 816.

*State v. Mageo,* 78 Hawai'i 33, 37 n. 9, 889 P.2d 1092, 1096 n. 9 (App.1995). In other words, by holding that the trial court has the inherent power to dismiss an indictment upon "balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system," 65 Haw. at 56, 647 P.2d at 712, the *Moriwake* court implicitly rejected the view that the trial court's discretion was limited to "extraordinary situations."

Inasmuch as the *Moriwake* court was clearly cognizant of the deference to be given to the prosecution in pursuing criminal indictments, as well as the other interests at stake when it adopted the six-factor framework laid out in the opinion, any "separation of powers concerns" are subsumed within such framework. Accordingly, the ICA's injection of an additional "separation of powers" analysis into the six-factor *Moriwake* framework represents a departure from, and thus is in contravention of, Hawai'i's case law. It is unnecessary to look to cases outside this jurisdiction when Hawai'i case law on the issue exists and, especially, when the existing case law is on point.[8] Moreover, because any

---

8. The ICA majority's decision to reach out to foreign jurisdictions and adopt the language expounded in *Sauve* and *Gonzales* in the face of controlling Hawai'i law was a departure from

this court's precedent, which the ICA is bound to follow. The ICA majority thereby disregarded the well-settled principle that:

separation of powers concerns are, as indicated above, subsumed within the *Moriwake* analysis, the ICA's analysis on this point was unnecessary. At oral argument, the prosecution, in fact, conceded that any separation of powers concerns were included within the *Moriwake* factors.

Additionally, the ICA's citation to *Lincoln* is unavailing inasmuch as it is factually distinguishable and, therefore, inapposite. This court's decision in *Lincoln* was based primarily on the fact that the case *had been remanded* to the trial court *for a retrial;* thus, the trial court was without discretion to dismiss the indictment prior to the mandated retrial. Conversely, *Moriwake* and the instant case deal with the trial court's discretion to dismiss an indictment *after* one or more mistrials have been declared. * * *

Based on the foregoing, we hold that, by injecting an additional "separation of powers" analysis, taken from two out-of-state cases, into the *Moriwake* framework, the ICA acted in contravention of this jurisdiction's case law. Accordingly, we turn next to an examination whether the ICA, under *Moriwake,* erred in vacating the trial court's December 21, 2005 FOFs, COLs, and order.

### D. Application of the Moriwake Factors

#### 1. The Severity of the Offense Charged

■ Here, Hinton was charged with sexual assault in the third degree, which, as indicated by the trial court, is a class C felony. The trial court found that this factor weighed against retrial because (1) a class C felony "is the least serious felony class" and (2) there were "no special circumstances ... in terms of injury," when "looking at the offense itself." Conversely, the ICA determined that this factor weighed in favor of a

retrial because, although "the statutory classification of the offense is a legitimate reference point," the prosecution "contended that Hinton was a sexual predator, while the defense portrayed him as an innocent victim" and that, therefore, "[t]here [was] a strong societal interest in having a jury resolve that dispute." SDO at *2. We agree; however, the same can be said for every criminal prosecution. Indeed, as the *Moriwake* court explicitly recognized, "society has a strong interest in punishing criminal conduct." 65 Haw. at 56, 647 P.2d at 712. Nevertheless, we conclude that the trial court's determination that the severity of the offense factor weighs against retrial did not "exceed the bounds of reason" because, when considered in light of, or as compared with, other felony offenses (such as murder, rape, or kidnapping), the charged offense is less serious. We do not suggest, however, that "less serious" equates with "not serious." We emphasize that, by assessing sexual assault in the third degree as "less serious," it is not our intent to minimize the impact that a perpetrator's conduct has upon a victim or to suggest that society has less of an interest in punishing such criminal conduct. In this case, we hold—contrary to the ICA—that the trial court did not abuse its discretion in finding that the first *Moriwake* factor weighed against retrial.

#### 2. The Number of Prior Mistrials and the Circumstances of the Jury Deliberations Therein, So Far as is Known

■ The trial court found that this factor weighed in favor of a retrial because there had been only one trial and, although the jury indicated that it was eight to four for

Under the rule of *stare decisis, where a principle has been passed upon by the court of last resort, it is the duty of all inferior tribunals to adhere to the decision, without regard to their views as to its propriety,* until the decision has been reversed or overruled by the court of last resort or altered by legislative enactment. *Robinson v. Ariyoshi,* 65 Haw. 641, 653, 658 P.2d 287, 297 (1982) (emphasis added) (format altered) (citation omitted). When the ICA fails to follow precedent, it casts the law in disarray, creating uncertainty for trial courts, the prosecution, and the defense. Indeed, the ICA has been

inconsistent in its treatment of *Moriwake. See State v. Rumbawa,* No. 27902, 2007 WL 2570227 (App. Aug. 30, 2007)(SDO), *cert. denied,* No. 27902 (Haw. Jan. 29, 2008) (upholding the trial court's dismissal of indictments pursuant to *Moriwake* over dissent's separation of powers arguments relying on, *inter alia, Sauve* and *Gonzales* ). In light of the fact that Hawai'i Rules of Appellate Procedure Rule 35 (2008) now permits SDOs to be cited for persuasive value, it is especially important for the ICA to consistently follow precedent, which, in the instant case, it failed to do.

acquittal at one point, it seemed confused. The ICA agreed with the trial court's assessment "that the jury had trouble following the evidence" and additionally reasoned that, inasmuch as the case against Hinton was "not a particularly complex case, . . . there [was] a basis for concluding that another jury would be able to reach a verdict." SDO at *2. We agree with the ICA that the trial court did not abuse its discretion in finding that the second factor weighed in favor of a retrial.

### 3. The Character of Prior Trials in Terms of Length, Complexity and Similarity of Evidence Presented

■ The trial court determined that this factor weighed against retrial because (1) the trial was not very complicated and (2) the key issue was credibility—Hinton's versus that of the complainant and her mother. The ICA disagreed with the trial court's assessment of this factor and reasoned that "the fact that there [had] been only one prior trial weighs significantly in favor of allowing a retrial." SDO at *3. Specifically, the ICA reasoned:

> While the supreme court in *Moriwake* recognized that dismissal could be appropriate after a single mistrial, the opinion implies that such dismissals would be rare. 65 Haw. at 57, 647 P.2d at 713. Concerns about the unfairness of subjecting a defendant to the burden of multiple trials, *id.* at 56, 647 P.2d at 712, are less strong when a defendant has only been subjected to one prior trial.

*Id.* at *3. The ICA seemed particularly troubled by the fact that Hinton did "not cite[ ] any appellate decision from Hawaiʻi or any other jurisdiction in which a dismissal after a single mistrial based on a hung jury was affirmed." *Id.* at *3.

The ICA was correct that the *Moriwake* court "recognized that dismissal could be appropriate after a single mistrial, [but that] the opinion implies that such dismissals would be rare." 65 Haw. at 57, 647 P.2d at 713 (holding that, in certain circumstances, "the preclusion of a second" trial would be appropriate). However, the fact that Hinton failed to cite to a single appellate decision affirming a dismissal after only a single mis-

trial is not fatal to his position. Indeed, such dismissals are seemingly rare and should not be encouraged as a common practice; nevertheless, the *Moriwake* court squarely placed the discretion in the hands of the trial court to determine under which "certain circumstances" dismissal after one or more mistrials would be appropriate. Here, the trial court, in weighing this factor, found in favor of dismissal because (1) the trial was not very complicated and (2) the key issue was credibility. The trial court's determination was not unreasonable, and, thus, we conclude, contrary to the ICA, that the trial court's finding that the third factor weighed against retrial was not an abuse of discretion.

### 4. The Likelihood of Any Substantial Difference in a Subsequent Trial, if Allowed

■ The trial court believed that this factor was an important factor and determined that the evidence submitted in a subsequent trial, if allowed, "would be substantially similar. It would not differ all that much." Apparently, the ICA agreed, stating that "it does not appear likely that the [prosecution] will introduce significantly different evidence in another trial." SDO at *4. Accordingly, we agree with the ICA that the trial court did not abuse its discretion in concluding that this factor weighed against retrial.

### 5. The Relative Case Strength

■ With regard to the relative case strength factor, the trial court stated:

> On the [trial] court's evaluation of the evidence, I think—and this is the [trial] court's personal view—it weighs in favor of retrial. But this factor should be, I think, discounted in view of the [supreme] court's opinion in *State v. Lincoln*[, 72 Haw. 480, 825 P.2d 64 (1992) ]. I don't think the [trial] court's view of the evidence should determine whether there's a retrial or not. *It can come into balance, but I don't think the court should place too much weight on that.*

(Emphasis added.) In our view, the trial court's belief that this factor should be "discounted" under *Lincoln* was based on an

incorrect reading of that case. In that regard, we believe the trial court erred.

We recognize, however, that the trial court stated that, were it to evaluate the evidence, it would find that this factor weighed in favor of retrial and, additionally, that it believed that the relative case strength factor could "come into balance," when weighing the *Moriwake* factors (although it would not give this factor too much weight). Nothing in *Moriwake* indicates that all factors must be given equal weight or that certain factors must be given more weight than others. We, therefore, believe that, although the trial court did not issue a specific finding or conclusion on this factor, it did consider it. The record reflects that the trial court—in its final analysis—"balanced" the relative case strength factor and determined it weighed in favor of retrial. We, therefore, hold that the trial court's erroneous reading of *Lincoln* was harmless. Thus, giving due deference to the trial court's determination, we hold that this factor weighs in favor of retrial.

6. **The Professional Conduct and Diligence of Respective Counsel, Particularly That of the Prosecuting Attorney**

Here, the trial court determined that this factor weighed against retrial inasmuch as the attorneys for both parties "did a good job." SDO at 13. The ICA did not contend that this factor weighed in favor of retrial. In sum, the trial court considered all of the factors enunciated in *Moriwake* and, recognizing that the circumstances presented "a close case," determined that, "in balancing all of the afore-mentioned factors, the interests of the [prosecution] do not outweigh the fundamental fairness to the defendant as well as orderly functioning of the court system."

Based on the discussion *supra*, none of the trial court's findings or conclusions "exceed the bounds of reason or disregard rules or principles of law or practice." Thus, we agree with Judge Foley that the trial court did not abuse its discretion in dismissing the indictment against Hinton. Inasmuch as the ICA majority determined otherwise, we hold that it erred.

## IV. CONCLUSION

Based on the foregoing, we hold that the ICA erred in (1) injecting an additional "separation of powers" analysis into the *Moriwake* framework and (2) holding that the trial court abused its discretion in dismissing the indictment with prejudice. Accordingly, we reverse the ICA's September 18, 2008 judgment on appeal and affirm the trial court's December 21, 2005 FOFs, COLs, and order granting Hinton's motion to dismiss the indictment with prejudice.