**Electronically Filed
Supreme Court
SCWC-15-0000156
22-APR-2019
07:51 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

IOSEFA MEAFUA PASENE,
Petitioner/Defendant-Appellant and
ZORRO R. RYE, aka Zorro Ramon Rye, Respondent/Defendant.

SCWC-15-0000156

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000156; CR. NO. 09-1-0472)

APRIL 22, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ., AND
CIRCUIT JUDGE VIOLA, IN PLACE OF POLLACK, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

The right to a fair trial, guaranteed to criminal

defendants by both the Constitution of the United States and the

Constitution of the State of Hawai'i, is a fundamental principle

upon which our justice system is built.  U.S. Const. amend. VI;
Haw. Const. art. I, § 14.  In the instant case, we are called
upon to determine whether multiple instances of improper
prosecutorial conduct cumulatively jeopardized the defendant's
right to a fair trial.

Iosefa Meafua Pasene was charged with Murder in the
Second Degree and Carrying or Use of Firearm in the Commission of
a Separate Felony.  After two prior trials resulted in mistrials
due to hung juries, Pasene was convicted of both offenses in a
third jury trial held by the Circuit Court of the First Circuit
(circuit court).[1]  The Intermediate Court of Appeals (ICA)
affirmed.

On certiorari, Pasene challenges the circuit court's
rulings: (1) denying his pre-trial Moriwake motion to dismiss;
(2) permitting a Honolulu Police Department (HPD) detective to
testify as to why another suspect was ruled out; (3) admitting
cell phone site records into evidence; (4) admitting evidence of
his meetings and transactions with an undercover HPD officer; (5)
denying his request to excuse a juror; and (6) denying his
motions for mistrial and motion for a new trial due to
prosecutorial misconduct.

Although the first five issues are without merit, we

---

[1] The Honorable Richard W. Pollack presided over the first jury
trial.  The Honorable Rom A. Trader presided over the second and third jury
trials.

2

hold that the cumulative effect of the prosecutor's improper conduct was so prejudicial as to jeopardize Pasene's right to a fair trial.  We therefore vacate Pasene's convictions and remand this case to the circuit court for further proceedings consistent with this opinion.

## I.  BACKGROUND

Pasene, Cedro Muna (Muna), and Antonius Paul Toloai (Toloai) were released from police custody in the early hours of March 28, 2009, after being arrested the previous afternoon.  At the time of their release, Pasene and Muna were dressed alike and had similar physical characteristics, other than the fact that Pasene had a short beard, while Muna did not.[2]

Later that morning, at around 4:00 a.m., Joseph Peneueta (Peneueta) and several others were gathered outside the Pauahi Recreation Center in Chinatown.  A blue Buick sedan drove up to the group and stopped in front of them.  Two men, each carrying a firearm, exited the car and advanced toward Peneueta.  They shot Peneueta several times, killing him.[3]  Roughly two

---

[2]     Photos taken by HPD officers the previous afternoon show Pasene and Muna wearing plain white t-shirts with short mustaches and long hair. Pasene was wearing black shorts and white shoes, while Muna was wearing long black pants and gray shoes.  Contemporaneous police records describe Pasene as a 21-year-old Samoan male with black hair and brown eyes, standing 6'2" tall, and weighing 250 pounds.  Police records from the same time period describe Muna as a 22-year-old Samoan male with black hair and brown eyes, standing 6'1" tall, and weighing 240 pounds.

[3]     The medical examiner testified that Peneueta died "as a result of heavy bleeding due to injuries to his vital organs caused by . . . gunshot and shotgun injuries."  All were fatal wounds.

hours later, a blue Buick sedan was reported burning just outside of Wahiawā.

## A.    Pre-trial Proceedings

Pasene was indicted by a grand jury in connection with Peneueta's killing and charged with, inter alia, Murder in the Second Degree, in violation of Hawaiʻi Revised Statutes (HRS) § 707-701.5 (2014), and Carrying or Use of Firearm in the Commission of a Separate Felony, in violation of HRS § 134-21 (2011).  Pasene was tried a total of three times for these crimes.

### 1.    <u>Moriwake</u> Motion to Dismiss

After his first two trials resulted in mistrials due to the juries' inability to reach unanimous verdicts, Pasene filed a motion to dismiss his indictment with prejudice, pursuant to <u>State v. Moriwake</u>, 65 Haw. 47, 647 P.2d 705 (1982).  The <u>Moriwake</u> court set forth the following six factors for a trial court to consider in determining whether to dismiss an indictment after one or more hung jury mistrials:

> (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney.

<u>Moriwake</u>, 65 Haw. at 56, 647 P.2d at 712-13.

4

The circuit court considered each of these factors in turn. First, with regard to the severity of the offenses charged, the circuit court noted that the charges facing Pasene were "among the most serious there are . . . clearly cut[ting] against a dismissal." Second, with regard to the number of mistrials and the circumstances of the jury deliberations therein, the circuit court opined that "there were somewhat dissimilar circumstances," apparently referencing the fact that the final jury tally was 9 to 3 in favor of guilty for the first trial and 9 to 3 in favor of not guilty for the second trial. The circuit court determined this factor thus weighed against dismissal. Third, the circuit court found that each of the two trials lasted between 3 and 4 weeks, and the evidence presented was largely similar, favoring dismissal.

Zorro Ramon Rye (Rye) was tried as Pasene's co-defendant in the first two trials, but was acquitted at the conclusion of the second trial. The circuit court noted that the dynamic of the case changed as a result of Rye's acquittal and determined that the fourth Moriwake factor therefore cut against dismissal. With regard to the fifth Moriwake factor, the circuit court stated that its evaluation of the relative strength of the case cut against dismissal, as it found "ample evidence" for a jury to reach a unanimous decision. Finally, the circuit court opined that the professional conduct and diligence of counsel did not weigh for or against dismissal.

5

Finding that the only <u>Moriwake</u> factor weighing in favor of dismissal was the character of the prior trials in terms of length, complexity and similarity of the evidence presented, the circuit court denied Pasene's motion to dismiss and set the case for a third trial.

**2.    Admissibility of Cell Phone Site Records**

Pasene filed Motion in Limine No. 3, seeking to exclude from evidence cell phone site records associated with a specific phone (the Phone).  The cell phone site records were produced by Vince Monaco (Monaco), a network engineering manager and custodian of records for Mobi PCS (Mobi).  Pasene filed similar motions in limine prior to the first and second trials.  It appears that in reaching its ruling on Motion in Limine No. 3, the circuit court relied on Monaco's testimony from the first trial, as well as its prior rulings.

The cell phone site records listed the following information for each call placed or received by the Phone from March 27, 2009 to April 3, 2009: time and date of call initiation; phone number connected to; call duration; and street address of the cell tower utilized to connect the call.  As a result, the records purport to show the general location of the Phone at various times on the date of Peneueta's killing.  Under the State's theory of the case, Pasene was the Phone's primary user.

In the first trial, Monaco testified that he produced

6

the records pursuant to a subpoena, using a program that he created. When prompted by Monaco, the program compiled information from call records associated with the Phone and a cell site database, both generated and maintained by Mobi. Although Monaco could not say that the program was widely accepted within the cellular service industry, he testified that Mobi utilizes the same process of combining information in call records and the cell site database in its regularly-conducted troubleshooting and quality-control activities. Monaco further testified that the process is simple enough to be performed manually, and was in fact done manually prior to the creation of his program.

Monaco testified that Mobi's call records are recorded, generated, and maintained by computers, and that the accuracy of the records is important to Mobi. Monaco added that the switch used to generate Mobi's call records is fully redundant to prevent errors and alarmed to alert the operator of any errors that do occur. In addition, Monaco stated that the switch's manufacturer guaranteed it to work "99.999 percent of the time," but admitted that he did not know whether the switch was ever tested for accuracy or error.

Motion in Limine No. 3, filed prior to the third trial, was identical to a motion in limine that Pasene filed prior to the second trial. The motions challenged the admissibility of the cell phone site records as business records under Hawai'i

Rules of Evidence (HRE) Rule 803(b)(6), arguing that the records were not kept in the ordinary course of business and that the methodology used to create the records did not meet the foundational requirements of State v. Montalbo, 73 Haw. 130, 828 P.2d 1274 (1992).

The circuit court denied Pasene's motion in limine before the second trial and allowed the cell phone site records to be admitted as business records under Hawai'i Rules of Evidence (HRE) Rule 803(b)(6) (2016). In reaching its ruling, the circuit court found that Mobi kept "information and data regarding its equipment and systems, including the cell phones, as well as the cell towers, as part of its regular business and that . . . information or data . . . is recorded at or near the time of the event." It explained that compiling clearly admissible data into a report in response to a subpoena did not "cause it to run afoul [of] the prohibition against records prepared . . . in anticipation of litigation." Furthermore, although the circuit court acknowledged that the records are "not the type that are normally generated in connection with [Mobi's] business," and were produced in preparation for trial, it found "no indication whatsoever that [the] records or reports lack trustworthiness in any way."

The circuit court affirmed its ruling on Pasene's prior motion and denied Motion in Limine No. 3, allowing the cell phone site records to be admitted into evidence for purposes of the

third trial.

> **3. Admissibility of Testimony Regarding Meetings and Transactions With Undercover HPD Officer Le**

Prior to trial, Pasene also filed Motion in Limine No. 4, seeking to exclude from evidence testimony pertaining to drug-related meetings and transactions that occurred between Pasene and undercover HPD Officer Khan Le (Officer Le) in the three weeks leading up to Peneueta's shooting. Pasene argued that testimony regarding the nature of the meetings and transactions constituted evidence of prior bad acts. Asserting that the State's only legitimate purpose for introducing the evidence was to link Pasene to the Phone, defense counsel offered to stipulate that Pasene was in possession of the Phone at the dates and times he was contacted by Officer Le, while reserving the right to present evidence that Pasene was not in possession of the Phone at the time of the shooting. Pasene argued such a stipulation would preserve the probative value of the testimony while eliminating its prejudicial impact. The State declined to so stipulate.

Pasene then argued that the evidence should be excluded under HRE Rule 403 (2016) because its probative value was substantially outweighed by the danger of unfair prejudice. The circuit court granted in part and denied in part Motion in Limine No. 4, in order to reduce the testimony's prejudicial effect while retaining its probative value. The circuit court explained

that the testimony was relevant to explain "law enforcement['s] concern as to the escalation of problems between the two rival groups or gangs in the Chinatown area" and to show "a tie-in to a phone, a cell phone, as well as a blue Buick." In order to reduce the testimony's prejudicial effect, the circuit court limited the allowable testimony to exclude "evidence of Defendant Pasene's gang membership and the fact that he is believed to be engaged in the sale or transaction of drugs," as well as "any mention of drugs, money or money transactions of any kind."

**B.   Third Jury Trial**

**1.   Overview**

At trial, the State presented testimony from two eye-witnesses, Gabriel Sakaria and Richard Tagataese, who both identified Pasene as the driver of the blue Buick sedan and one of Peneueta's killers. The State also presented testimony from Officer Le to tie Pasene to the Phone and the blue Buick sedan, and used cell phone site records to show that the Phone was in Peneueta's general vicinity around the time of his killing, and in the blue Buick sedan's general vicinity around the time it was set on fire.

Under the State's theory, Muna could not have been involved in Peneueta's shooting, as he was in a taxi cab heading to the Plaza hotel when the shooting occurred. To support this theory, the State presented testimony from Detectives Gregory McCormick and Theodore Coons regarding the steps they took to

10

investigate Muna.  Chinatown surveillance footage, which was not admitted into evidence, was also discussed at trial as a basis for the detectives' decision to rule Muna out as a suspect.

Pasene relied on the defense of mistaken identity, arguing that Muna could have been the driver who shot and killed Peneueta.  Pasene presented testimony from Linda Del Rio, a bail bond agent, that Muna confessed to her on the morning of Peneueta's killing that he'd shot someone.  Pasene also testified that he was not in possession of the Phone or the blue Buick sedan at the time of Peneueta's killing.

During the trial, defense counsel requested that the circuit court excuse Juror No. 1 because he interacted with a witness and discussed the interaction with another juror.  This request was denied.  Defense counsel also objected throughout the trial and made several motions for mistrial on the bases of evidentiary violations and prosecutorial misconduct.  Although the circuit court sustained numerous objections raised by defense counsel, admonished the Deputy Prosecuting Attorney (DPA) multiple times, and expressed concern that the DPA's pattern of conduct could jeopardize Pasene's right to a fair trial, it denied Pasene's motions.

**2.  The State's Opening Statement**

In his opening statement, the DPA suggested that two groups of Samoan men - one local, and one from San Francisco - were engaged in a territorial dispute.  According to the DPA,

11

evidence presented at trial would show that Pasene shot and killed Peneueta in response to escalating tensions between the two groups.

Defense counsel made ten objections during the DPA's opening statement. The circuit court sustained six objections on the basis of improper argument, and warned the DPA, "I've sustained many appropriate objections raised at this point. You know what argument is. You are engaging in argument. Do not do that."

The DPA then stated:

> [A]s far as Mr. Muna being a suspect, you will hear the testimony of Detective Greg McCormick and Detective Theodore Coons, both of whom investigated Cedro Muna and eliminated him as a suspect <u>because the Chinatown cameras were able to capture Mr. Muna getting into the taxi</u>, as testified to by the taxi driver and as stated to them by Mr. Muna, and the taxi driver and <u>the timing allowed the police to eliminate Mr. Muna as a suspect, because as the car</u> . . . was driving away . . . shots were heard.

(Emphases added).

Defense counsel objected, as the surveillance footage from the Chinatown camera referenced by the DPA was "not recoverable," and therefore would not be admitted into evidence. Although no curative instruction was given, the circuit court addressed the DPA at the bench as follows:

> [G]iven the number of objections that have been sustained thus far, you know, one would question whether or not this is just inadvertent or you are blatantly disregarding the Court's – the rulings about the limitations of opening statement.
> . . .

12

> [Y]ou have this tendency to launch into an argumentative tone and syntax, that certainly a conclusion could be drawn, that could be reasonable based upon the number of those instances, to question whether or not that is, in fact, inadvertent or if you are doing it purposefully.  I certainly hope it's not the latter, . . . [b]ut I ask you to try to be careful.  Because this is the third trial.  <u>We want to make sure that everybody has a fair opportunity to be heard</u>.

(Emphasis added).

At the conclusion of the State's opening statement, defense counsel moved for a mistrial, arguing the DPA's use of improper argument forced him to repeatedly object and prejudiced Pasene's opportunity to receive a fair trial.  The circuit court denied the motion, but admonished the DPA, acknowledging that any further improper conduct could jeopardize Pasene's right to a fair trial:

> [T]he reality is, . . . the sum total of the repeated references or arguments that you made during your opening really . . . causes me to seriously question whether or not it is intentional or it is purely inadvertent.  I don't care, to be quite frank about it.  <u>Both sides are entitled to a fair trial</u>.
> . . .
> I'm putting you clearly on notice . . . we're in a third trial . . . [and] we want to make sure that everything is done as appropriately and properly as possibly can be.  You want a fair trial.  <u>Mr. Pasene deserves a fair trial</u>, as well.  And playing fast and loose with . . . the rules or conventions of court really is not going to serve you well if you choose to do that. . . .  [G]oing forward I will full well expect you to conduct yourself . . . without the need to inject improper statements, comments, or what have you.

(Emphases added).

### 3. Evidence

The jury was presented with testimony elicited from 27 witnesses during the evidence phase of trial. The evidence most directly relevant to the issues on appeal is set forth below.

### a. Gabriel Sakaria

Gabriel Sakaria (Sakaria) testified that he, Richard Tagataese (Tagataese), and Peneueta grew up together and had been friends for over 20 years. Sakaria stated that he witnessed Pasene and Peneueta arguing outside a liquor store on the morning of Peneueta's shooting. He heard Pasene say, "[w]here we from we don't fight, we shoot, shoot to kill." Sakaria later walked to the nearby recreation center. He was sitting next to Peneueta outside the center, when a four-door blue Buick sped up the street and stopped right in front of them. Two men got out of the car. The driver was holding a rifle and his face was uncovered. Sakaria identified him as Pasene. The passenger was holding a shotgun, but Sakaria was unable to identify him because his face was covered.

Sakaria testified that the driver walked towards Peneueta with the rifle pointed at him and said, "What's up now?" Sakaria stated he was roughly three feet away from the driver, the lighting conditions were good, and he had an unobstructed view of the driver's face. Sakaria testified that he heard a gunshot and ran. He heard at least ten more gunshots as he fled. When he returned to the area, Peneueta was lying in the street.

Sakaria also testified that he knew Muna and was "[h]undred percent" positive that the driver was Pasene, and not Muna.

### b.   Richard Tagataese

Tagataese testified that he was outside the recreation center with Peneueta and Sakaria at the time of Peneueta's shooting.  Tagataese's testimony regarding the details of Peneueta's shooting was substantively consistent with Sakaria's version of events.  Tagataese identified Pasene as the driver of the car, and one of Peneueta's killers.

### c.   Darren Kawelolani

Taxi cab driver Darren Kawelolani (Kawelolani) testified that one of his regular customers, Daniel Ropati (Ropati), called him from Chinatown at around 4:00 a.m. on the morning of Peneueta's killing.  When Kawelolani arrived in Chinatown roughly 10 minutes later, Ropati no longer wanted a ride, so Kawelolani picked up two male passengers that he did not know.  Kawelolani testified that after the passengers entered his cab, he saw a blue car speed by within three feet of the cab. The blue car's windows were rolled up and tinted or dirty. Shortly after the blue car passed by, Kawelolani heard what sounded like firecrackers or eight to ten loud gunshots.  He proceeded to drive to the Best Western Airport Plaza Hotel, where he dropped off one of the passengers.  He then returned to Chinatown, where he dropped off the other passenger.

Kawelolani was interviewed by HPD Detective Gregory

15

McCormick (Detective McCormick) four or five days after Peneueta's killing.  Kawelolani testified that during the interview, he identified Toloai as one of the passengers based on a single photograph presented to him by Detective McCormick.  Kawelolani was unable to identify the second passenger.

At trial, Kawelolani testified that the driver of the blue car had long hair.  When asked if the driver had any facial hair, Kawelolani responded, "Not that I recall."  However, after reviewing a copy of the statement he gave to the police four or five days after the shooting, Kawelolani testified that the driver of the blue car "not only had long hair, but he also had a beard."  When asked if he ever saw the driver of the blue car after his initial sighting, Kawelolani responded, "Yes. . . .  I saw him on the news on the television."  Kawelolani did not identify Pasene as the driver of the blue car or the person that he saw on the news.

### d.    Detective Gregory McCormick

Detective McCormick was the lead homicide detective assigned to investigate Peneueta's killing.  He testified that shortly after the shooting, he was given the names of three possible suspects: Pasene, Muna, and Toloai.  The DPA asked Detective McCormick, "[w]hat conclusion did you come to regarding Cedro Muna being one of the shooters?"  Defense counsel objected to the question, arguing that Detective McCormick's conclusion regarding Muna was irrelevant and that the question was improper

because it was equivalent to asking for Detective McCormick's personal opinion about whether Muna was involved in Peneueta's killing. The circuit court sustained in part and overruled in part the objection, acknowledging the possibility that the jury might use Detective McCormick's opinion for an improper purpose. Accordingly, the circuit court limited the DPA's line of questioning to the "efforts [Detective McCormick] made relative to Mr. Muna and the conclusion of those efforts" - whether they cleared him as a suspect in the investigation.

McCormick testified that Muna was interviewed, but not arrested in connection with Peneueta's killing. The DPA then questioned Detective McCormick regarding his elimination of Muna as a suspect, prompting defense counsel to object and move for a mistrial:

> **[DPA]:** Did you interview other witnesses that could corroborate what Mr. Muna had told you?
>
> **[Detective McCormick]:** Yes.
>
> **[DPA]:** Okay. Who was that?
>
> **[Detective McCormick]:** One of 'em was Antonias Toloai.
>
> **[Defense counsel]:** Your Honor, can we approach again please?
>
> **The Court:** All right. Very well.
>
> (The following proceedings had at the bench:)
>
> **[Defense counsel]:** [T]he problem is . . . I'm never going to cross [Toloai], and he says [Toloai's] statement matches Cedro [Muna]'s. And that's a violation of the confrontation clause and my client's right to cross-examine witnesses against him. And

17

> that's why it's hearsay and it's problematic. And so
> I'd like to ask for a mistrial. <u>I move for a mistrial
> because this violates a whole variety of rules of
> evidence.</u>
>
> . . .
>
> **The Court:** [Defense counsel] has a valid concern and
> point, because you know, . . . once you start placing
> the moniker of corroboration on there, essentially
> that's saying that . . . what they said to the police
> was the same thing Mr. Muna had said. And he's not
> going to get an opportunity to cross-examine those
> folks [because they are not going to testify].

(Emphasis added).

The circuit court denied Pasene's motion for mistrial and instructed the jury that Detective McCormick's testimony that "Muna was in fact interviewed and that he was not arrested," would stand. The circuit court struck all of the testimony that followed and instructed the jury to "treat it as if you didn't hear it," acknowledging that disregarding the stricken testimony may be "easier said than done."

At the bench, the circuit court also addressed whether, and to what extent, the DPA could question Detective McCormick regarding Chinatown surveillance footage that he reviewed in the course of his investigation. The DPA represented to the circuit court that the surveillance footage showed Muna getting into Kawelolani's taxi cab.[4] However, defense counsel objected to the allowance of any testimony regarding the content of the

---

[4]     The DPA also referred to this footage in the State's opening statement. <u>See</u> section I.B.2.

surveillance footage because it "somehow was unrecorded or destroyed."  In recognition of the fact that the surveillance footage was not turned over to the defense and could not be viewed by the jury, the circuit court proposed limiting Detective McCormick's testimony regarding the surveillance footage to the following:

> [T]o the extent that [the DPA] examines [Detective McCormick] on the video evidence, that . . . following the interview of Mr. Muna[,] he viewed the video and . . . based upon what he viewed in the video, . . . essentially Mr. Muna was cleared.
>
> . . .
>
> [B]asically [that the detectives] chose not to further investigate Mr. Muna.

Defense counsel replied, "If he keeps it to that, that's fine."

Detective McCormick testified that although he viewed the Chinatown surveillance footage in the course of his investigation, it was "not recoverable."  The State examined Detective McCormick regarding the Chinatown surveillance footage as follows:

> **[DPA]:** As part of your investigation of Cedro Muna, you reviewed some of the camera videotape from Chinatown; is that correct?
>
> **[Detective McCormick]:** Yes.
>
> **[DPA]:** Okay.  And based upon your review of that – of that video, that was part of the reason why you were able to eliminate Mr. Muna as a suspect?
>
> **[Detective McCormick]:** That was part of the reason, yes.

**[DPA]:** Okay.  And in addition to other parts of your investigation which – in addition to the video that you saw led you to eliminate Mr. Muna as a suspect in the shooting?

**[Detective McCormick]:** Yes.

Defense counsel did not object.  Detective McCormick also testified that a blue Buick, with the license number JGA 055, was reported burning just before 6:00 a.m. on the day of Peneueta's shooting.  The car was registered to Sylvia Hall (Hall).  Detective McCormick further testified that the car was registered to Muna until Hall registered it in her name on February 10, 2009.

### e.    Detective Theodore Coons

Detective Coons was the scene investigator assigned to Peneueta's killing.  When asked whether, based on his review of the Chinatown surveillance footage, he ruled Muna "in or out," Detective Coons confirmed that Muna was not arrested in connection with Peneueta's killing and testified that his review of the Chinatown surveillance footage "was one of the aspects" that led to the elimination of Muna as a suspect.

The State moved surveillance footage recorded at the Best Western Airport Plaza Hotel into evidence.  Detective Coons testified that he viewed the footage at the hotel in the course of his investigation, and at the time, it was marked with a date

20

and time stamp.[5]  The footage admitted into evidence lacked such temporal references, but Detective Coons testified that it was "an exact copy" of the footage he reviewed at the hotel. Detective Coons also confirmed that a car with the license plate number JGA 055, registered to Hall, was reported burning near Waialua shortly after the shooting.  Detective Coons further testified that he met with Hall and she did not have a driver's license.  Without objection by defense counsel, Detective Coons described Hall as "a very simple person.  She was accompanied by a social worker.  She was sober.  She appeared coherent and she understands.  But it was obvious that she was a simple . . . person."

### f.   Vince Monaco

The circuit court permitted Monaco, the network engineering manager and custodian of records for Mobi, to testify as an expert in "cell phone technology and the technique of locating and plotting origins of cell phone calls using cell phone records."  Monaco testified that, according to Mobi's records, the Phone was associated with the name Fasi Lya.

Pursuant to the circuit court's ruling regarding Motion

---

[5]     The custodian of records testified that the hotel surveillance footage was recorded on March 28, 2009, but there is nothing in the record to indicate that the footage was recorded around the time of Peneueta's killing. The footage was introduced by the State in order to: 1) explain the HPD detectives' efforts to fully investigate Muna before eliminating him as a suspect; and 2) corroborate Muna's alibi that he was in a taxi cab on the way to the Best Western Airport Plaza Hotel at the time of the shooting.

in Limine No. 3,[6] the circuit court admitted into evidence cell phone site records and text message records associated with the Phone.  Monaco testified that the cell phone site records indicated that the Phone utilized cell towers in or near Chinatown at 3:43 a.m., 4:06 a.m., and 4:12 a.m. on the morning of Peneueta's shooting.  The Phone also connected to cell towers in the Wahiawā area at 5:50 a.m. and 5:52 a.m.[7]  The text message records also included a message sent from the Phone at 4:47 a.m. on March 29, 2009, the day after Peneueta's killing.  The message stated, "I need a lawyer because they trying 2 put a hot one on me so don't talk on da phone."

### g.    Undercover Officer Khan Le

Officer Le testified that he first met Pasene on March 10, 2009, while working undercover in Chinatown.  Officer Le arranged meetings with Pasene on March 12, 13, 19, 26, and 30 by communicating with Pasene using the Phone.  Officer Le stated that of all the times he called the Phone, only Pasene answered.  Officer Le also testified that Pasene drove to four or five of their meetings in a dark-colored sedan with the license plate

---

[6]    With respect to all three jury trials, defense counsel challenged the admissibility of the cell phone site records through motions in limine. These motions were denied.  Prior to admitting the records into evidence during the third trial, the circuit court noted "all prior positions" taken by defense counsel and gave defense counsel an opportunity to object further. Defense counsel stated he had "[n]othing additional to what we've already placed on the record."

[7]    Wahiawā is located between Chinatown, where Peneueta's killing took place, and Waialua, where the blue Buick sedan was reported burning.

22

number JGA 055, and that two of their meetings took place in the car.

Officer Le testified that the purported purpose of his final meeting with Pasene, which occurred two days after Peneueta's killing, was "to have a transaction." In apparent violation of the circuit court's ruling on Motion in Limine No. 4, which precluded "any mention of drugs, money or money transactions," the DPA asked Officer Le how much money was involved in the transaction, and he responded "$6,000." Defense counsel did not object. Officer Le also stated that Pasene was arrested during that final meeting. On cross-examination, defense counsel asked Officer Le, "[o]n [March] 26, 2009, money was also exchanged, right?" Le responded affirmatively. Defense counsel then asked Officer Le to confirm that the exchange "was in the amount of $4,900." Officer Le responded, "correct."

**h.    Request to Excuse Juror No. 1**

During a recess following the conclusion of Officer Le's testimony, Juror No. 1 approached Officer Le and asked if he practiced jiu-jitsu. Officer Le responded by shaking his head to indicate "no." Juror No. 1 told Juror No. 2 about his exchange with Officer Le, but there was no further interaction between Juror No. 1 and Officer Le.

The court asked Juror No. 1 if the interaction left him with "any type of impression or reaction" that might "affect [his] ability to sit on this case," to which he replied "No."

23

The court then asked Juror No. 1 if he had any concern that the interaction "might in some small way, even inadvertently . . . affect the way [he looks] at either the evidence or . . . the application of the law to the facts" in this case. Juror No. 1 again replied "No." Neither the DPA nor defense counsel elected to question Juror No. 1 further. When asked if either counsel thought an inquiry with Juror No. 2 would be appropriate, both the DPA and defense counsel deferred to the circuit court's determination that such an inquiry was unnecessary.

Pasene asked the circuit court to excuse Juror No. 1, arguing that the juror's conduct demonstrated an unwillingness or inability to follow the circuit court's instructions.[8] The circuit court denied Pasene's request, finding "nothing about [the] particular encounter . . . remotely touched upon the facts in this case," and concluding Juror No. 1's conduct was "fairly innocuous."

### i. Linda Del Rio

The defense put on testimony from bail bond agent Linda Del Rio (Del Rio). Del Rio testified that she posted bail bonds

---

[8] At the start of trial, the circuit court gave the following instruction to the jury:

> We talked about seeing the attorneys, right, out and about the courthouse or anyplace else. If you see them, you can say "hi"; see witnesses, you know, same goes for that. But please have as minimal interaction as you possibly can with them because we want to make sure the trial is fair in actuality - both in actuality but as well as in perception . . . .

for Pasene, Muna, and Toloai in the early hours of March 28, 2009.  She recalled that Muna owned a blue four-door sedan, which he tried to use as collateral.  Del Rio also stated that Muna used the car as collateral when she bailed him out on a previous occasion.

Del Rio also testified that Muna called her between 10:30 a.m. and 11 a.m. on the morning of Peneueta's shooting.  He told her he "was in Wahiawa, and that he had done something and he needed to . . . turn himself in."  According to Del Rio, Muna also confessed to her, "Aunty, I shot someone."

**j.    Cedro Muna**

Muna testified that Pasene was using a car that belonged to someone named Fasi - not the blue Buick sedan - prior to their arrest on March 27, 2009.  He also stated that Pasene did not own a phone at the time.  Muna further testified that he, Pasene, and Toloai went to Chinatown after they were released from police custody on the morning of March 28, 2009.  There, he witnessed Pasene and Peneueta arguing outside a liquor store.

Muna testified that he saw Pasene point a shotgun at Ropati roughly 30 minutes later, telling Ropati to "get away or he was going to shoot him."[9]  Muna testified that Ropati called a cab, but gave it away, despite having been threatened with a shotgun a couple of minutes earlier.  Muna stated he and Toloai

---

[9]    This allegation provided the foundation for Count IV, Terroristic Threatening in the First Degree.  Pasene was found not guilty of Count IV in the second jury trial.

got into the cab and before the cab pulled away, he saw a blue Buick pass by.  He recognized the car as his old car and identified the car's driver as Pasene.  As the cab drove off, Muna heard about ten gunshots.  Muna testified that he took the taxi to the Best Western Airport Plaza Hotel.

The DPA showed Muna surveillance footage from the hotel's elevator camera that had been admitted into evidence. Muna testified that he recognized himself in the footage based on his clothing.  Muna stated that he left the hotel just ten minutes after he arrived, explaining, "I forgot that my hotel is in Waikiki, . . . [s]o I got in [another] cab and I went to Waikiki."

Muna denied attempting to use the blue Buick as collateral to secure his bail bond.  He testified that he sold the blue Buick to someone named Tia in January 2009, and he was present when Tia sold it to Pasene in February 2009.  Muna also denied telling Linda Del Rio that he shot someone on March 28, 2009.  He stated that he had a good relationship with Del Rio when she bailed him out on the morning of Peneueta's shooting, but their relationship turned "bad" when he "jumped bail."  Muna explained that he left Hawai'i two months after Peneueta's shooting.  Because he missed a court date, his bail was revoked. Muna was ultimately picked up on a warrant and extradited to Hawai'i in February 2013.

Muna admitted that he gave a statement to the

detectives on the day of Peneueta's shooting, which made no mention of Pasene threatening Ropati with a shotgun, or of Pasene driving by in the blue Buick. Upon his extradition, Muna gave a second statement regarding the events of March 28, 2009, in which he stated that he saw Pasene threaten Ropati with a gun. On cross-examination, defense counsel asked Muna, "you knew that if you cooperated in a murder case, your attorney could . . . argue to the judge in your case . . . this guy was helpful to the State, and . . . a judge could consider that . . . right?" Muna responded: "Yeah."

### k. Iosefa Pasene

Pasene admitted to using the Phone from time to time, but testified that Fasi owned and paid for the Phone. Pasene explained that he used the Phone because Fasi lived nearby, most of the phone numbers Pasene used were saved on the Phone, and Fasi had a second phone. Pasene also admitted to arguing with Peneueta on the morning of Peneueta's killing, but he stated that he had not met Peneueta prior to that occasion and he denied saying anything like "where I'm from, I shoot, and I shoot to kill."

Pasene testified that although he had driven the blue Buick sedan on several occasions, he borrowed it from Muna and believed it belonged to Muna. According to Pasene, several other people drove the car, including Muna, Toloai, and Ropati. Pasene also testified that he had Fasi's car, not the blue Buick, when

27

he was arrested on March 27, 2009. Pasene stated that Fasi picked up the car while he was in custody, leaving him without a vehicle. When he realized Fasi's car wasn't where he left it, Pasene asked his cousin for a ride to his girlfriend's house a couple blocks away.

Pasene testified that he gave the Phone and Fasi's car keys to his cousin "to give back to Fasi." Pasene stated that he stayed at his girlfriend's house until around noon, when he got the Phone back and used it to call Del Rio. When asked if he recalled sending a text message from the Phone at 7:47 a.m. on the day after Peneueta's killing, which said, "I need a lawyer because they trying 2 put a hot one on me so don't talk on da phone." Pasene replied, "I don't recall that text message. I know I didn't send that text message." Pasene denied shooting and killing Peneueta.

**4.   Jury Instructions**

At the conclusion of the evidence phase of the trial, the circuit court gave the jury several instructions, including the following:

> Statements or arguments made by lawyers are not evidence. You should consider their arguments to you, but you are not bound by their memory or interpretation of the evidence.
> . . .
> You must disregard entirely any matter which the Court has ordered stricken.
> . . .
> You must not consider in any way nor speculate upon the nature or subject matter involved in the alleged interactions and the alleged transactions.

28

> . . .
> You have heard evidence relating to out-of-court
> identifications of the defendant and other individuals
> made by witnesses to police investigators in this
> case.  Some of these identifications reportedly were
> made after viewing a single photograph as opposed to a
> group of photographs presented to the witness.  This
> type of identification procedure may be suggestive and
> may or may not affect the reliability of the witness's
> identification.

**5.    The State's Closing Argument**

In closing, the DPA summarized the State's theory of the case: Pasene shot and killed Peneueta to send a message.  He thought he could get away with the killing because the Phone and the blue Buick sedan were not registered to him.  However, the State argued, evidence from his meetings and transactions with undercover Officer Le and eye-witness testimony established his guilt beyond a reasonable doubt.  Defense counsel objected several times during the DPA's closing argument.  Four such instances are discussed below.

The DPA stated, "Hall did not have a license [and] had a social worker. . . .  Now, who benefits if a mentally handicapped person is the registered owner [of the blue Buick]?" (Emphasis added).  Defense counsel objected, arguing that the comment was prejudicial and misstated the evidence.  Finding that the DPA's statement made an unfair inference, which "conjures up a different sort of scenario," the circuit court sustained the objection and instructed the jury to "disregard in its entirety the last statement of the [DPA] that Ms. Hall was . . . mentally

29

handicapped." It explained that there was no evidence that Hall was intellectually disabled introduced at trial and further instructed the jury to "disregard [the DPA's statement] and not consider it for any purpose whatsoever." Defense counsel moved for a mistrial. The motion was denied.

Later in the State's closing argument, defense counsel objected to the DPA's following statement:

> Cedro Muna was not one of the shooters, but he was one of the suspects. The detectives told you that. How was he eliminated as a possible shooter? They didn't go on his word. What they did was they told you they went to the Chinatown station and they looked at the camera, and they saw a person that looked like Cedro Muna.

(Emphasis added).

Defense counsel again moved for a mistrial, as the circuit court made clear that because the Chinatown surveillance footage was not admitted into evidence, its contents were inadmissible. The circuit court sustained the objection, provided a cautionary instruction to the jury, and denied Pasene's motion for mistrial. The circuit court proceeded to admonish the DPA at the bench as follows:

> [T]here was absolutely no evidence with respect to what was seen on the video. And your statement during closing argument . . . is injecting information that was never provided to this jury. . . . I've told you ad nauseam that you have to confine your arguments and questioning during this case to what's appropriate. And for whatever reason, you're either incapable of doing that or you refuse. I'm not sure what it is, but there's no excuse for it.

(Emphasis added).

The DPA later stated, "Who else IDs Mr. Pasene?  Darren the taxi driver."  Defense counsel objected on the basis that Darren Kawelolani did not identify Pasene as the driver of the blue Buick.  Kawelolani testified that he saw the driver on the news, but did not identify Pasene as that person.  The circuit court overruled the objection and asked the DPA to make a clarifying statement.  Accordingly, the DPA stated:

> Darren [Kawelolani] said that he saw the driver, and he later . . . recognized that person on the news. Cedro Muna, who is sitting directly behind Darren [Kawelolani] at that same moment, sees the same blue car coming towards the taxi . . . .  He recognizes the car because he used to be the owner of that car, and he recognizes the driver as Iosefa Pasene.

Defense counsel did not object to the DPA's restatement.

The DPA commented on the credibility of Sakaria and Tagataese's eye-witness testimony by stating, "let's go to Gabe [Sakaria] and Richard [Tagataese].  Ask yourself this.  Imagine, all of you, imagine one of your friends that you've known for 20 years . . . ."  Defense counsel objected, arguing that the DPA improperly asked the jurors to put themselves in the shoes of the State's eye-witnesses.  In response to this objection, the circuit court asked the DPA to rephrase.  The DPA then stated:

> Imagine a person has a friend for over 20 years and they're standing next to him and unexpectedly a car stops, two guys jump out, and they shoot him in his back and kill him and that's your good friend.  That's your close friend. . . .  You, as a friend, would want the person who shot your close friend to be held and come to justice, so you're going to tell the truth if you're a friend and he was a friend for over 20 years.

31

(Emphases added).

### 6.   Pasene's Closing Argument

In his closing argument, defense counsel stressed the presumption of innocence and emphasized that the question before the jury was whether the State proved beyond a reasonable doubt that Pasene killed Peneueta.  Defense counsel then highlighted evidence suggesting Muna, rather than Pasene, may have been one of Peneueta's killers: the blue Buick sedan was registered to Muna before it was put in Hall's name; Pasene testified that he borrowed the car from Muna in the weeks leading up to the shooting; Del Rio testified that Muna tried to use the car as collateral the day before the shooting; Muna and Pasene had similar dress and physical attributes on the morning of the shooting; Muna "act[ed] very strange" the morning of the shooting by going to the wrong hotel; Del Rio testified that Muna told her, "Aunty, I shot someone" on the morning of the shooting; Detective McCormick testified that Muna was one of the three named suspects; and Muna fled the jurisdiction following the shooting and only testified that Pasene threatened Ropati with a gun upon his extradition to Hawai'i four years later.

Defense counsel concluded that the State had failed to carry its burden of proving beyond a reasonable doubt that Pasene killed Peneueta.

### 7.   The State's Rebuttal Closing

The DPA began the State's rebuttal closing by stating,

32

"[defense counsel] had this nice drawing of <u>presumption of</u> <u>innocence, blah, blah, blah</u>, right, it's our burden, and we're over here and he draws a stick man."  (Emphasis added).  Defense counsel objected, but the court overruled the objection.  The DPA then proceeded to state, "John Gotti, when he goes to trial, he's presumed innocent. . . .  Charles [Manson] . . . ."  Defense counsel objected once more.  The circuit court sustained the objection and instructed the jury to "disregard the last statements of the [DPA]."  It also addressed the DPA at the bench as follows:

> [T]he examples that you're using, . . . I believe tend to have an inflammatory nature about them . . . .
> [W]hen you start injecting the specter of these other heinous examples[,] . . . one danger is, is that the jury might be led to react either in a more emotional other than an objective and unbiased way.

### 8.    Motion for Mistrial

Following the conclusion of the State's rebuttal closing, defense counsel renewed his motion for mistrial and stated the following outside the presence of the jury:

> In each of the three trials, two of the most hotly litigated issues [were] . . . whether or not the jury would know that [Hall] was mentally handicapped and . . . what the detective saw in the [Chinatown surveillance] video. . . .  After all of that, in closing argument, knowing that . . . was nowhere in evidence, [the DPA] gets up there and tells the jury that [Hall] was mentally handicapped and tells the jury that the detective[s] saw Cedro Muna on the [Chinatown surveillance] video getting into the ca[b]. . . .  You can't unring a bell, and [the DPA] knows that, and that's why he told the jury that because now it's in their head.

33

The circuit court denied defense counsel's motion for mistrial, but addressed the DPA as follows:

> [I]t is clear that there has been . . . a pattern of conduct in this particular case that does one of two things.  It either implicates a knowing disregard of the rules of court and evidence and ethical considerations, or it certainly suggests a pattern of not complying with those. . . .  [I]t certainly at a bare minimum would suggest a lack of either understanding or an unwillingness or an inability to follow certain rules and conventions that attend trial.
> . . .
> [B]ased upon what I've seen, I think there's at least at a bare minimum a suggestion that your facility with either the rules or what is expected of your conduct as a trial prosecutor is certainly lacking in some regard . . . .

**9.    Jury Verdict**

The jury found Pasene guilty as charged as to both Murder in the Second Degree and Carrying or Use of Firearm in the Commission of a Separate Felony.

**D.    Post-trial Proceedings and Judgment**

Pasene filed a post-trial motion for mistrial, or in the alternative for a new trial, alleging prosecutorial misconduct prejudiced his right to a fair trial.  Pasene argued that the DPA engaged in improper argument in his opening statement, "violated countless rules of evidence, rules of professional conduct, and rules of court" throughout the evidence portion of the trial, and "on several occasions informed the jury of facts not in evidence, some of which had been expressly prohibited by order of [the circuit court]" during his closing

34

argument. Pasene specifically addressed multiple instances of alleged misconduct, which he later raised on appeal to the ICA and again on certiorari. Pasene argued that "[t]he prosecutorial misconduct throughout [the third] trial, and especially in closing argument, were not errors made due to inexperience or lack of the law on the part of the [DPA]. Instead, the prosecutorial misconduct was calculated and knowingly committed." He concluded that, based on the nature of the DPA's conduct, the sufficiency of the circuit court's curative instructions, and the weakness of the State's evidence, there was a reasonable possibility that the DPA's misconduct might have contributed to the conviction, and thus the granting of a mistrial or a new trial was warranted.

The circuit court denied Pasene's motion, stating, "this Court finds and concludes that the State's conduct was not improper, and therefore has not risen to the level of misconduct warranting the granting of [Pasene's] Motion." The circuit court further concluded that even if the DPA's conduct was improper, granting of Pasene's motion was still unwarranted in light of the promptness of the circuit court's curative instructions and the strength of the State's evidence.

The circuit court entered an Amended Judgment of Conviction and Sentence (Amended Judgment), sentencing Pasene to concurrent terms of life imprisonment with possibility of parole for Murder in the Second Degree and twenty years' imprisonment

35

for Carrying or Use of Firearm in the Commission of a Separate Felony.

On appeal, the ICA concluded that the circuit court did not err in: (1) denying Pasene's Moriwake motion to dismiss; (2) permitting Detective McCormick to testify regarding the elimination of Muna as a suspect; (3) admitting the cell phone site records; (4) admitting evidence of Pasene's meetings and transactions with Officer Le; or (5) denying Pasene's request to excuse Juror No. 1. With regard to Pasene's allegations of prosecutorial misconduct, the ICA characterized some of the DPA's conduct as improper and noted:

> We do not condone or excuse a prosecutor's conduct in making improper remarks in opening statement or closing statement or asking improper questions during trial. We agree with the Circuit Court that the prosecutor's conduct in this case created issues that could easily have been avoided and unnecessarily raised the potential for a mistrial.

However, the ICA concluded that "individually and cumulatively the [DPA's] alleged acts of misconduct did not deny Pasene of a fair trial and do not warrant vacating his convictions." Accordingly, the ICA affirmed the circuit court's Amended Judgment.

## II. DISCUSSION

On certiorari, Pasene argues the circuit court abused its discretion in denying his pre-trial Moriwake Motion to Dismiss. He also challenges the circuit court's rulings admitting into evidence cell phone site records, testimony

regarding the meetings and transactions he had with Officer Le, and testimony regarding the elimination of Muna in the investigation of Peneueta's killing.  In addition, Pasene argues the circuit court abused its discretion and deprived him of a fair trial in denying his request to excuse Juror No. 1. Finally, Pasene challenges the denial of his various motions for mistrial, and his post-trial Motion for Mistrial or New Trial on the basis of prosecutorial misconduct.

As discussed below, we conclude that the cumulative effect of the DPA's improper conduct was so prejudicial as to jeopardize Pasene's right to a fair trial.  We therefore vacate Pasene's convictions and remand this case to the circuit court for further proceedings.

We affirm the ICA's Memorandum Opinion with regard to all other issues raised on appeal.

A.   **The Circuit Court Did Not Abuse its Discretion in Denying Pasene's Pre-trial <u>Moriwake</u> Motion to Dismiss**

Dismissing an indictment with prejudice following one or more hung-jury mistrials is a proper exercise of a trial court's power to administer justice.  <u>Moriwake</u>, 65 Haw. at 55, 647 P.2d at 712.  Determining whether an indictment should be dismissed with prejudice following the declaration of one or more mistrials is "a matter of balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system."  <u>Id.</u>

at 56, 647 P.2d at 712 (citing State v. Braunsdorf, 297 N.W.2d 808, 817 (Wis. 1980)).

After his first two trials resulted in hung-jury mistrials, Pasene filed a Moriwake motion to dismiss his indictment with prejudice. Citing to specific facts in the record, the circuit court considered each of the factors set forth in Moriwake and acknowledged the need to "balance [Pasene's] rights against . . . the interest of the State in pursuing a prosecution for yet a third time." The circuit court determined that the only Moriwake factor weighing in favor of dismissal was the character of the prior trials in terms of length, complexity and similarity of evidence presented. It denied Pasene's motion to dismiss accordingly.

We review a trial court's ruling on a motion to dismiss an indictment for an abuse of discretion. State v. Hinton, 120 Hawaiʻi 265, 273, 204 P.3d 484, 492 (2009) (citing State v. Akau, 118 Hawaiʻi 44, 51, 185 P.3d 229, 236 (2008)). A trial court abuses its discretion when it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Wong, 97 Hawaiʻi 512, 517, 40 P.3d 914, 919 (2002) (citing State v. Klinge, 92 Hawaiʻi 577, 584, 994 P.2d 509, 516 (2000)). "The burden of establishing [an] abuse of discretion is on appellant, and a strong showing is required to establish it." Id. (citing State v. Kupihea, 80 Hawaiʻi 307, 312, 909 P.2d 1122, 1127

(1996)).

It is undisputed that the first <u>Moriwake</u> factor - the
severity of the offenses charged - weighs against dismissal.
Reasonable minds might differ regarding whether the second
<u>Moriwake</u> factor - the number of prior mistrials and the
circumstances of the jury deliberation therein - weighs against
dismissal.  On one hand, like in <u>Moriwake</u>, there were two hung
jury mistrials in the instant case, seemingly cutting in favor of
dismissal.  On the other hand, the final jury tally varied
significantly between the first and second trials, and as the
circuit court noted, each jury is different.  Thus, it cannot be
said that the circuit court's determination that this factor
weighs against dismissal clearly exceeds the bounds of reason.

As for the third <u>Moriwake</u> factor - the character of
prior trials in terms of length, complexity and similarity of
evidence presented - the record substantiates the circuit court's
determination that the first two trials were of similar duration
and complexity.  It also appears the State put its best case
forward in each trial, and there is no indication in the record
that any new evidence would be presented in a third trial,
weighing in favor of dismissal.

With regard to the fourth <u>Moriwake</u> factor - the
likelihood of any substantial difference in a subsequent trial -
it is apparent that the acquittal of co-defendant Rye would
likely affect the third trial by allowing the State to narrow the

scope of its argument and the evidence presented in order to focus its case on Pasene's prosecution.  This supports the circuit court's conclusion that the fourth Moriwake factor weighs against dismissal.

The circuit court determined that the fifth Moriwake factor - its own evaluation of relative case strength - weighed against dismissal.  It cannot be said that the circuit court abused its discretion in making this determination.  Similarly, deference to the circuit court's evaluation of the remaining Moriwake factor - the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney - is appropriate.

The circuit court's denial of Pasene's Moriwake motion to dismiss was thus based on careful evaluation of each of the Moriwake factors, and supported by facts in the record.  As such, Pasene has failed to make the requisite strong showing that the circuit court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice.  Accordingly, the circuit court did not abuse its discretion in denying Pasene's pre-trial motion to dismiss.

**B.   The Circuit Court Did Not Err in Admitting the Cell Phone Site Records Into Evidence**

Pursuant to HRE Rule 803(b)(6):

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events,

conditions, opinions, or diagnoses, as shown by the
testimony of the custodian or other qualified witness
. . . [is not excluded by the hearsay rule], unless
the sources of information or other circumstances
indicate lack of trustworthiness.[10]

Pasene filed Motion in Limine No. 3, seeking to exclude
from evidence cell phone site records associated with the Phone
on the grounds that the State did not lay a sufficient foundation
to show the records met the requirements of HRE Rule 803(b)(6).

The circuit court denied Pasene's motion and allowed
the cell phone site records to be admitted into evidence as a
business record under HRE Rule 803(b)(6).  As set forth below, we
conclude that the cell phone site records can properly be
admitted into evidence under HRE Rule 803(b)(6), and that the
circuit court did not abuse its discretion in admitting the

---

[10]     The federal counterpart to HRE Rule 803(b)(6), Federal Rules of
Evidence (FRE) Rule 803(6), provides:
>     A record of an act, event, condition, opinion, or diagnosis [if
>     not excluded by the rule against hearsay, regardless of whether
>     the declarant is available as a witness] if:
>     (A)   the record was made at or near the time by – or from
>           information transmitted by – someone with knowledge;
>     (B)   the record was kept in the course of a regularly conducted
>           activity of a business, organization, occupation, or
>           calling, whether or not for profit;
>     (C)   making the record was a regular practice of that activity;
>     (D)   all these conditions are shown by the testimony of the
>           custodian or another qualified witness, or by a
>           certification that complies with Rule 902(11) or (12) or
>           with a statute permitting certification; and
>     (E)   the opponent does not show that the source of information or
>           the method or circumstances of preparation indicate a lack
>           of trustworthiness.

We note that "[a]lthough cases interpreting provisions in the Federal Rules of
Evidence are of course not binding on us, we may refer to them for their
persuasive authority in interpreting similar provisions of the Hawai'i Rules
of Evidence."  State v. Fitzwater, 122 Hawai'i 354, 366 n.7, 227 P.3d 520, 532
n.7 (2010).

records based on its determination that there were no indicia of a lack of trustworthiness.

1.    **The Cell Phone Site Records Can Properly be Admitted Into Evidence Under HRE Rule 803(b)(6)**

The circuit court found the cell phone site records were admissible under HRE Rule 803(b)(6)'s business records exception to the hearsay rule.  We review the admissibility of hearsay evidence under the right/wrong standard.  State v. Fitzwater, 122 Hawai'i 354, 362, 227 P.3d 520, 528 (2010) (citations omitted).

The circuit court qualified Monaco, Mobi's custodian of records, as an expert in cell phone technology and the technique of locating and plotting origins of cell phone calls using cell phone records.  Monaco testified that Mobi maintains call records and a cell site database in the regular course of its business.  Monaco further testified that Mobi relies on its call records and cell site database in its regular billing, maintenance, and repair operations and their accuracy is important to Mobi.

Monaco explained that he produced the cell phone site records using a program that he created.  When prompted by Monaco, the program compiled information from Mobi's call records and a cell site database.  Monaco stated that the process performed by the program is simple enough to be done manually, and was in fact done manually prior to the creation of his program.  He further testified that Mobi utilizes the same

process in the course of its regularly-conducted troubleshooting and quality-control activities.

Pasene argues that the cell phone site records were inadmissible under HRE Rule 803(b)(6) because they were compiled using a computer program pursuant to a subpoena, and were therefore not created in the regular course of Mobi's business. However, HRE Rule 803(b)(6) does not require that a compilation of data be produced in the regular course of business at or near the time of the events recorded, provided that the underlying data used to generate the compilation was so produced.  See, e.g., United States v. Loney, 959 F.2d 1332, 1340-41 (5th. Cir. 1992) (a 35-page compilation of computer records was admissible as a business record because the underlying data was admissible); United States v. Russo, 480 F.2d 1228, 1240 (6th Cir. 1973) ("It would restrict the admissibility of computerized records too severely to hold that the computer product as well as the input upon which it is based, must be produced at or within a reasonable time after each act or transaction to which it relates."); United States v. Fujii, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under [FRE] Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business.") (emphasis in original); U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co., 576 F.3d 1040, 1043 (9th Cir. 2009) ("evidence that has been compiled

from a computer database is also admissible as a business record, provided it meets the criteria of [FRE] Rule 803(6)"); United States v. Hernandez, 913 F.2d 1506, 1512 (10th Cir. 1990) ("Computer data compilations may constitute business records for purposes of [FRE] Rule 803(6), and may be admitted at trial if a proper foundation is established.") (citation, internal quotation marks and brackets omitted).

Here, the data underlying the cell phone site records was admissible pursuant to HRE Rule 803(b)(6) because it was produced in the ordinary course of Mobi's business, at or near the time of the events recorded. Thus, the fact that the cell phone site records are a compilation of that data produced by a computer program does not render the records inadmissible.

Moreover, the fact that the cell phone site records were produced by the program only when prompted by a human query does not destroy the records' admissibility under HRE Rule 803(b)(6). A record containing underlying data that meets HRE Rule 803(b)(6)'s requirements for admissibility is not rendered inadmissible simply because it is produced by human query. See People v. Zavala, 156 Cal. Rptr. 3d 841, 846-47 (Cal. Ct. App. 2013) (call records were not inadmissible simply because they were produced by human query, where the underlying data was recorded and stored by a reliable computer system at or near each time a user made a phone call). Because the cell phone site records at issue are a compilation of two sets of admissible

data, they can properly be admitted into evidence under HRE Rule 803(b)(6).[11]

### 2. The Circuit Court Did Not Abuse its Discretion in Admitting the Cell Phone Site Records Into Evidence

"A record that is otherwise admissible under HRE Rule 803(b)(6) may nevertheless be inadmissible if the sources of information or other circumstances indicate a lack of trustworthiness."  Fitzwater, 122 Hawai'i at 363, 227 P.3d at 529 (internal quotation marks and brackets omitted).  The circuit court found "no indication whatsoever that [the cell phone site records] lack trustworthiness in any way" and admitted them into evidence.  We review a circuit court's determination as to the trustworthiness of hearsay evidence for an abuse of discretion. Id.

Monaco, Mobi's custodian of records, was qualified by the circuit court as an expert witness without objection by defense counsel.  He had personal knowledge of the information contained in the records and the process by which they were produced, and was available for cross-examination.  Monaco testified that the data contained in Mobi's call records is automatically generated by Mobi's switch every time a phone call is made on its system.  See Commonwealth v. McEnany, 732 A.2d

---

[11]    Although not relied upon by the circuit court, we note that the cell phone site records also could have been admitted under HRE Rule 1006. See Loney, 959 F.2d at 1341 (Where the underlying data is admissible under the business records exception, but is voluminous and cannot conveniently be examined in court, a summary, compilation, or calculation of that data can be admitted under FRE Rule 1006).

1263, 1273 (Pa. Super. Ct. 1999) (call records systematically and contemporaneously created by a computer system in the regular course of business were admissible despite the fact that they were translated from binary code to English for purposes of trial). Monaco also testified as to the switch's accuracy, stating that the switch's manufacturer guaranteed it to work "99.999 percent of the time." He added that the switch is fully redundant and alarmed in order to prevent errors and to alert the operator if any errors do occur.

Mobi had no apparent interest in the disposition of this case and the records were produced in a non-adversarial setting without "the motivation of prevailing against a particular party." Fitzwater, 122 Hawai'i at 364, 227 P.3d at 530. Further, there is no evidence or allegation of bias, tampering, or falsification on the part of Mobi or Monaco with regard to the cell phone site records, the process by which they were produced, or the underlying sources of information.

The fact that the cell phone site records were produced in response to a subpoena issued by law enforcement does not preclude them from being admitted into evidence as a business record under HRE Rule 803(b)(6). We have recognized that "[w]hen records are prepared in anticipation of litigation, they will often, but not always, demonstrate [a] lack of trustworthiness." Id. at 363, 227 P.3d at 529 (emphasis added) (citing 2 Kenneth S. Broun et al., McCormick on Evidence § 288 at 312 (6th ed. 2006)).

46

However, despite the fact that the cell phone site records may have been produced for the purpose of prosecuting this case, the sources of information underlying the records and the circumstances by which they were produced do not indicate a lack of trustworthiness.  Thus, the fact that the cell phone site records were produced pursuant to a subpoena does not deprive them of their business-record character.  Fujii, 301 F.3d at 539.

Pasene fails to establish that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  See id. (the trial court did not abuse its discretion in admitting check-in and reservation records where defendant failed to establish that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness").  We therefore conclude that the circuit court did not abuse its discretion in finding the cell phone site records to be trustworthy and admitting the records under HRE Rule 803(b)(6).[12]

C.    **The Circuit Court Did Not Abuse its Discretion in Admitting Evidence of Pasene's Meetings and Transactions With Officer Le**

Relevant evidence may be excluded pursuant to HRE Rule 403 "if its probative value is substantially outweighed by the

_____

[12]    Pasene's other arguments regarding the admissibility of the cell phone site records similarly lack merit.  Monaco's testimony was sufficient to satisfy the foundational requirements of Montalbo, 73 Haw. 130, 828 P.2d 1274, and concerns regarding the accuracy of the locations reflected in the records go to the weight of the records, rather than their admissibility.

danger of unfair prejudice[.]" Pasene filed Motion in Limine No. 4, seeking to exclude testimony regarding various meetings and transactions he had with Officer Le under HRE Rule 403.

The circuit court granted in part and denied in part the motion, allowing Officer Le to testify regarding the meetings and transactions, but precluding "any mention of drugs, money or money transactions." A trial court's balancing of the probative value of relevant evidence against the prejudicial effect of such evidence under HRE Rule 403 is reviewed for an abuse of discretion. State v. Klafta, 73 Haw. 109, 115, 831 P.2d 512, 516 (1992).

Officer Le's testimony was relevant to connecting Pasene to the Phone and the blue Buick sedan by showing that: (1) Pasene used the Phone on several occasions in the weeks leading up to Peneueta's killing and on an additional occasion two days after the killing; and (2) Pasene used the blue Buick sedan on four or five occasions prior to the killing. The testimony also carries an inherent risk of prejudice, as the jury could infer that Pasene's meetings and transactions with Officer Le involved the sale of drugs or other bad acts.

It is apparent from the hearing transcript that, as a result of such weighing, the circuit court granted in part and denied in part Pasene's Motion in Limine No. 4 in order to reduce the testimony's prejudicial effect while retaining its probative value. "[T]he determination of the admissibility of relevant

48

evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion . . . ." State v. Behrendt, 124 Hawaiʻi 90, 108, 237 P.3d 1156, 1174 (2010) (citation omitted). The record reflects that the circuit court properly exercised its discretion in order to preserve the probative value of Officer Le's testimony and reduce its prejudicial effect. Therefore, the circuit court's determination that the probative value of the testimony permitted was not substantially outweighed by the danger of unfair prejudice does not clearly exceed the bounds of reason or otherwise constitute an abuse of discretion.

We affirm the ICA's determination that the circuit court's ruling admitting evidence of Pasene's meetings and transactions with undercover Officer Le does not constitute an abuse of discretion, and shall be left undisturbed.

**D. The Circuit Court Did Not Abuse its Discretion in Allowing Officer McCormick to Testify Regarding the Elimination of Muna as a Suspect**

The circuit court permitted Detective McCormick to testify that Muna was eliminated as a suspect in the investigation of Peneueta's killing, in part, due to his review of the Chinatown surveillance footage, which was not in evidence.[13]  Pasene argues this testimony is inadmissible under

---

[13]     As a preliminary matter, we note that the testimony Pasene now challenges comports with a proposition that the circuit court made at the bench, to which defense counsel acquiesced.  Defense counsel stated at the bench that it would be fine for Detective McCormick to testify that "he viewed the [Chinatown surveillance] video and that based on what he viewed in the video, that essentially Mr. Muna was cleared."

HRE Rule 701 (2016), as it constitutes lay opinion that Muna was innocent and, in any event, is inadmissible under HRE Rule 403, as the danger of unfair prejudice substantially outweighs its probative value.

First, as set forth below, Detective McCormick's testimony does not constitute lay opinion testimony subject to the restrictions of HRE Rule 701.  Second, the circuit court did not abuse its discretion under HRE Rule 403 in allowing the testimony.

1.    **Lay Opinion Testimony - HRE Rule 701**

Under HRE Rule 701, lay opinion testimony is only admissible if it is: (1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. "[A]dmission of opinion testimony is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." State v. Toyomura, 80 Hawai'i 8, 23-24, 904 P.2d 893, 908-09 (1995) (original brackets omitted) (quoting State v. Tucker, 10 Haw. App. 73, 89, 861 P.2d 37, 46 (1993)).

We need not apply the standard for admissibility of lay opinion testimony, as the testimony at issue does not constitute opinion.  Opinions are "beliefs, conclusions, and inferences that are distinguishable from facts."  Addison M. Bowman, Hawai'i Rules of Evidence Manual § 701-1[1], at 7-1 (2018-19 ed.).

Detective McCormick and Detective Coons - the lead homicide detective and the scene detective assigned to investigate Peneueta's killing - both testified that their review of the Chinatown surveillance footage contributed to the elimination of Muna as a suspect in their investigation. This is a fact, rather than a belief, conclusion, or inference. As such, this testimony does not constitute inadmissible lay opinion testimony that Muna was innocent.

**2.    Probative Value and Unfair Prejudice - HRE Rule 403**

Relevant evidence may be excluded pursuant to HRE Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" The circuit court determined that the testimony in question was probative to explain the steps that HPD detectives took in order to fully investigate Peneueta's shooting, and permitted Detective McCormick's testimony regarding the elimination of Muna as a suspect.[14] A trial court's balancing of the probative value of relevant evidence against the prejudicial effect of such evidence under HRE Rule 403 is reviewed for an abuse of discretion. Klafta, 73 Haw. at 115, 831 P.2d at 516.

Testimony describing the actions a police officer took during the course of an investigation may be admitted into

---

[14]    The circuit court explained at the bench: "[T]he fairness of the investigation, whether it's full and fair and what decisions were made in the course of the investigation, whether to focus on one or more individuals and to exclude others is something for the jury to consider."

evidence.  See State v. Feliciano, 2 Haw. App. 633, 636-67, 638 P.2d 866, 869-70 (1982) (hearsay statements may be admissible if they are offered to explain a police officer's conduct during an investigation leading up to the defendant's arrest).  Even if the testimony at issue were stricken, it would be apparent from other facts in evidence that Muna was eliminated as a suspect in the investigation, and that the Chinatown surveillance footage was one of many pieces of evidence considered by the detectives in ruling Muna out.  The testimony therefore poses little danger of unfair prejudice.  Because the danger of unfair prejudice does not substantially outweigh the testimony's probative value, the circuit court did not exceed the bounds of reason or otherwise abuse its discretion in admitting the testimony at issue.

**E.  The Circuit Court Did Not Abuse its Discretion in Denying Pasene's Request to Excuse Juror No. 1**

Pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 24(c), it is within the trial court's discretion to "replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."  See State v. Jones, 45 Haw. 247, 262, 365 P.2d 460, 468 (1961) ("The rule is universally recognized that the matter of excusing trial jurors lies in the discretion of the trial judge.").  Pasene asked the circuit court to excuse Juror No. 1, arguing that the juror's interaction with Officer Le demonstrated an unwillingness or inability to follow the circuit

52

court's instructions.

The circuit court denied Pasene's request, finding nothing about the juror's interaction with Officer Le "remotely touched upon the facts in this case," and concluding that the interaction was therefore "fairly innocuous." We will not interfere with a trial court's ruling on a request to excuse a juror unless "it patently appears" that: i) the ruling constituted an abuse of discretion; and ii) the defendant was denied a fair trial as a result. State v. Crisostomo, 94 Hawai'i 282, 287, 12 P.3d 873, 878 (2000) (citing Jones, 45 Haw. at 262, 365 P.2d at 468).

Upon notification of their interaction, the circuit court individually questioned Juror No. 1 and Officer Le as to the substance and scope of the encounter. The circuit court then sought and obtained specific assurances from Juror No. 1 that the encounter would not affect the way he looked at the evidence or the application of the law, or otherwise affect his ability to serve as a juror. Finally, the circuit court allowed the DPA and defense counsel an opportunity to question Officer Le and Juror No. 1, and asked if either thought an inquiry with Juror No. 2 would be appropriate.

"The circuit court is in a better position than the appellate court to ascertain from the answers of the juror whether the juror is able to be fair and impartial." State v. Mark, 120 Hawai'i 499, 537-38, 210 P.3d 22, 60-61 (App. 2009)

53

(quoting State v. Cardus, 86 Hawai'i 426, 438, 949 P.2d 1047, 1059 (App. 1997)) (internal quotation marks omitted). Because the record reflects that the circuit court denied Pasene's request to excuse Juror No. 1 upon reasoned consideration following proper inquiry, the circuit court's ruling did not clearly exceed the bounds of reason or disregard rules or principles of law or practice. Thus, the circuit court did not abuse its discretion in denying Pasene's request to excuse Juror No. 1.

**F. The Circuit Court Abused its Discretion in Denying Pasene's Post-trial Motion for Mistrial or New Trial Based on Prosecutorial Misconduct**

"Prosecutorial misconduct may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citing State v. Pemberton, 71 Haw. 466, 796 P.2d 80 (1990). At trial, defense counsel made several motions for mistrial due to prosecutorial misconduct. Pasene also filed a post-trial motion for mistrial, or in the alternative for a new trial, alleging prosecutorial misconduct prejudiced his right to a fair trial. All of these motions were denied by the circuit court.

The denial of a motion for mistrial or new trial "is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion." State v. Furutani, 76 Hawai'i 172, 178-79, 873 P.2d 51, 57-58 (1994) (citations

omitted).  "Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction."  Klinge, 92 Hawai'i at 584, 994 P.2d at 516 (quoting State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999)) (internal quotation marks omitted).

In reaching this determination, we consider the following factors: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.  Id.  Moreover,

> [Even where] no single misstatement or other erroneous remark standing alone would have sufficient prejudicial weight to deprive the defendant of a fair trial, the cumulative weight of such errors may create an atmosphere of bias and prejudice which no remarks by the trial court could eradicate.  On appeal we must determine whether the cumulative effect of prejudicial conduct going to the issue of guilt is so strong that it overcomes the presumption that the curative remarks of the court have rendered the prejudicial remarks harmless.

State v. Kahalewai, 55 Haw. 127, 129, 516 P.2d 336, 338 (1973) (citation and internal quotation marks omitted).

Although each instance of the DPA's improper conduct, when examined in isolation, may not rise to the level of misconduct warranting the vacation of Pasene's convictions, as set forth below, the cumulative effect of the DPA's improper conduct was so prejudicial as to deprive Pasene of a fair trial.

See <u>Klinge</u>, 92 Hawai'i at 596, 994 P.2d at 528.

**1. Nature of the Conduct and Promptness of the Circuit Court's Curative Instructions**

Below, we discuss the first two factors in our analysis of prosecutorial misconduct together, highlighting the most significant instances of the DPA's improper conduct. Under the first factor, we consider "the nature of the challenged conduct in relation to our criminal justice system generally and the special role of the prosecutor specifically." <u>State v. Underwood</u>, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (citing <u>Rogan</u>, 91 Hawai'i at 412-15, 984 P.2d at 1238-41). With regard to second factor,

> [We consider] the extent to which a trial court's instruction to the jury minimized or eliminated the prejudicial effect of misconduct. <u>Rogan</u>, 91 Hawai'i at 415, 984 P.2d at 1241. When a court promptly addresses the impropriety, "a prosecutor's improper remarks are [generally] considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." <u>Id.</u> (quoting <u>State v. McGriff</u>, 76 Hawai'i 148, 160, 871 P.2d 782, 794 (1994)) (alteration in original).

<u>Underwood</u>, 142 Hawai'i at 327, 418 P.3d at 668.

Much like in <u>Pemberton</u>, the record in the instant case is replete with examples of the DPA's persistent failure – whether willful or inadvertent – to abide by the circuit court's instructions, our case law and rules regarding the ethical responsibilities of the prosecutor, and the American Bar Association's Criminal Justice Standards for the Prosecution. 71

56

Haw. 466, 796 P.2d 80. The DPA's improper statements pervaded every phase of trial, prompting defense counsel to object repeatedly. Some of these statements were particularly prejudicial, as they injected facts not in evidence that directly contradicted Pasene's core theory of the case, or served to denigrate fundamental constitutional protections guaranteed to criminal defendants.

Although the circuit court was diligent in its efforts to sustain defense counsel's objections and to promptly issue curative instructions to the jury where necessary, there were occasions where the circuit court failed to sustain defense counsel's objections to improper statements by the DPA, and failed to issue necessary curative instructions. Additionally, "the fact that defense counsel was repeatedly forced to object and the court repeatedly forced to sustain those objections and to issue cautionary instructions is likely to have had the . . . effect of focusing the jury's attention on that evidence and the fact that it was being suppressed." Pemberton, 71 Haw. at 476, 796 P.2d at 85 (citation omitted).[15]

As such, with regard to the first two factors in our analysis of prosecutorial misconduct, we conclude the circuit court's efforts were insufficient to eliminate the prejudicial

---

[15] The circuit court acknowledged that evidence may be prejudicial despite a prompt curative instruction, when it stated that it may be "easier said than done" for the jury to disregard stricken testimony.

effect of the DPA's improper conduct.

### a. The State's Opening Statement

"An opening statement merely provides an opportunity for counsel to advise an outline for the jury, the facts and questions in the matter before them." State v. Simpson, 64 Haw. 363, 369, 641 P.2d 320, 324 (1982) (citations omitted). It is not an opportunity to present argument, nor is it an opportunity to inject evidence that is otherwise inadmissible. See State v. Sanchez, 82 Hawaiʻi 517, 528, 923 P.2d 934, 945 (App. 1996).

The circuit court sustained six objections during the State's opening statement on the basis of improper argument. The circuit court stated at the bench, "I've sustained many appropriate objections raised at this point. You know what argument is. You are engaging in argument. Do not do that." Yet, the DPA's improper use of argument persisted. Although the repetitive nature of this conduct is concerning, the DPA's argumentative statements were relatively innocuous and the circuit court properly sustained defense counsel's objections. Thus, this improper conduct was not particularly prejudicial.

Significantly, however, the DPA also stated, "the Chinatown cameras were able to capture Mr. Muna getting into the taxi . . . and the timing allowed the police to eliminate Mr. Muna as a suspect, because as the car . . . was driving away . . . shots were heard." Defense counsel objected to the DPA's statement and the circuit court admonished the DPA at the bench,

questioning whether his conduct was "just inadvertent," or whether he was "blatantly disregarding the Court's - the rulings about the limitations of opening statement." However, the circuit court did not sustain or overrule the objection, or issue a curative instruction.

As mentioned above, the Chinatown surveillance footage referenced in this statement was not admitted at trial, and as a result, the circuit court prohibited the State from introducing evidence of its content. Thus, the DPA's statement improperly injected evidence that was not properly put before the jury. The prejudicial nature of this statement is especially concerning, as it asserted that video evidence directly contradicted Pasene's mistaken identity theory of the case - that Muna may have been the driver of the blue Buick who shot Peneueta.[16]

The DPA's comment was not corrected by the circuit

---

[16]    We note that video evidence can be particularly persuasive:
The persuasive power of videotape evidence . . . [is] intuitively obvious: If a picture is worth a thousand words, then how much more is a moving picture worth[?]
. . .
In the case of contemporaneous evidence, videotape is unmatched in its ability to capture the nuances of the setting and events that transpired.
. . .
[T]here is a strong tendency, for those who are used to television as the primary medium for gaining news and other information, to believe that any information imparted via television is true. . . . Thus, jurors may leap from the likely accuracy of the fact or circumstance depicted in a videotape to a relatively undiscriminating acceptance of inferences that are claimed to be supported by the evidence . . . .

JORDAN S. GRUBER, 44 AM. JUR. TRIALS 171 § 42 (1992).

court.    Thus, the prejudicial effect of the improper statement

was not sufficiently cured.

Defense counsel moved for a mistrial following the

conclusion of the State's opening statement "based on [the DPA's]

continuous and pervasive use of argument during his opening

statement."   The circuit court denied the motion, but put the DPA

"clearly on notice," warning him as follows:

> [T]he fact that we're in a third trial . . . should
> certainly be clear to everybody and that we want to
> make sure that everything is done as appropriately and
> properly as possibly can be.  You want a fair trial.
> Mr. Pasene deserves a fair trial, as well.  And
> playing fast and loose with, perhaps, some of the
> rules or conventions of court really is not going to
> serve you well if you choose to do that. . . . [G]oing
> forward I will full well expect you to conduct
> yourself in a manner that I believe you are entirely
> capable of doing, <u>without the need to inject improper
> statements</u>, comments, or what have you.

(Emphasis added).

### b.    Evidence Phase of Trial

"Leading questions should not be used on the direct

examination of a witness except as may be necessary to develop

the witness' testimony."   HRE Rule 611(c) (2016).   It is

undisputed by the State that the DPA improperly posed leading and

argumentative questions to Sakaria on redirect.   However, in each

of the four instances raised on appeal, the circuit court

sustained defense counsel's objection.   After sustaining the

first objection, the circuit court asked the DPA to rephrase his

question.   After sustaining the second objection, the circuit

court struck the question from the record.  After the circuit

court sustained the third objection, the DPA offered to rephrase

his question and the court asked him to "put the question to the

witness in a non-leading manner."  After the circuit court

sustained the fourth objection, the DPA concluded his redirect

examination.

Defense counsel again moved for a mistrial, arguing

that the DPA's improper conduct was depriving Pasene of a fair

trial, despite the circuit court's efforts to sustain his

objections and issue curative instructions.  The circuit court

denied the motion, but again warned the DPA:

> I'm here to tell you that you need to give some
> thought to how you intend to proceed during the
> balance of this trial, because in the end the record
> is going to bear out what it does and I make no
> promises with respect to how I choose to address those
> particular circumstances.  At this point two motions
> have been made; they're denied.  And -- but going
> forward, Mr. Pasene is entitled to a fair trial.
> You're entitled to a fair trial.  But when we start
> injecting these types of completely unavoidable
> circumstances into the case, it really does no one any
> good, and it does not further the search for the truth
> and the decision that this jury has to make.  So I'm
> telling you as straight as I possibly can.  You need
> to be a lot clearer and more circumspect in terms of
> the form of the questions you pose.

We generally "consider a curative instruction

sufficient to cure prosecutorial misconduct because we presume

that the jury heeds the court's instruction to disregard improper

prosecution comments."  State v. Wakisaka, 102 Hawai'i 504, 516,

78 P.3d 317, 329 (2003) (citation omitted).  Here, the circuit

court acted properly to promptly sustain each of defense counsel's objections and to issue curative instructions where necessary. As such, the circuit court's actions were sufficient to cure the impropriety of the DPA's conduct.

### c. The State's Closing Argument

A prosecutor is allowed wide latitude in discussing the evidence during closing argument. Rogan, 91 Hawai'i at 412, 984 P.2d at 1238. Prosecutors may "state, discuss, and comment on the evidence as well as draw all reasonable inferences from the evidence." Id. (citations omitted). "In other words, closing argument affords the prosecution . . . the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom." Id. at 413, 984 P.2d at 1239 (citation omitted).

However, this latitude is not without limit. "[T]he scope of [the prosecutor's] argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct." Id. (quoting ABA Prosecution Function Standard 3-5.8(a)). "A prosecutor exceeds the acceptable scope of closing argument when a statement cannot be justified as a fair comment on the evidence but instead is more akin to the presentation of wholly new evidence to the jury, which should only be admitted subject to cross-examination, to proper instructions and to the rules of evidence. Underwood, 142

Hawai'i at 326, 418 P.3d at 667 (quoting State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014) (internal quotation marks omitted).

### i.    Sylvia Hall

With regard to Hall, the DPA stated, "who benefits if a mentally handicapped person is the registered owner [of the blue Buick]?"  In response to defense counsel's objection, the circuit court instructed the jury to disregard the DPA's statement.  At the bench, the circuit court explained to the DPA that there was no evidence in the record that Hall was intellectually disabled, and opined that the DPA's statement made an unfair inference that "conjures up a different sort of scenario."  Defense counsel again moved for a mistrial, but the motion was denied.  Following conclusion of the conference, the circuit court reminded the jury that "the Court sustained the objection, instructed you to disregard in its entirety the last statement of the [DPA] that Ms. Hall was . . . mentally handicapped.  There was no evidence of the kind introduced at trial, so you will disregard that and not consider it for any purpose whatsoever."

The DPA's statement was improper, as it presents new and unsupported evidence to the jury.  The statement poses further danger of prejudice to Pasene's defense as it implies not only that Hall was intellectually disabled, but also that someone - perhaps Pasene - took advantage of that disability in order to avoid culpability for criminal activity.  However, the

63

statement's prejudicial effect was sufficiently negated by the circuit court's prompt and thorough curative instruction.

### ii. Chinatown Surveillance Footage

"A prosecutor's comment on matters outside the evidence is improper." State v. Walsh, 125 Hawai'i 271, 290-91, 260 P.3d 350, 369-70 (2011) (quoting State v. Tuua, 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011)) (internal quotation marks omitted). Similar to his improper comment in the State's opening statement, in the State's closing argument, the DPA asserted that detectives McCormick and Coons eliminated Muna as a suspect because "they went to the Chinatown station and they looked at the camera, and they saw a person that looked like Cedro Muna[.]" The circuit court sustained defense counsel's objection and admonished the DPA at the bench as follows:

> [T]here's no evidence . . . of what they saw on the video. There's evidence that the video was viewed, and that was part of the evidence or information they used to essentially continue their investigation further, but there was absolutely no evidence with respect to what was seen on the video. And your statement during closing argument . . . is injecting information that was never provided to this jury. . . .
>
> [Y]ou have to confine your arguments to the evidence that's been adduced. . . .
>
> And, you know, at this point, I've told you ad nauseam that you have to confine your arguments and questioning during this case to what's appropriate. And for whatever reason, you're either incapable of doing that or you refuse. I'm not sure what it is, but there's no excuse for it.

Defense counsel again moved for mistrial. The motion

was denied.  Following conclusion of the bench conference, the circuit court "specifically instructed" the jury to "completely disregard in its entirety the last statement made by the [DPA] with respect to what may or may not have been observed by law enforcement utilizing the Chinatown surveillance system as to Mr. Muna or anything else for that matter.  And so you are not to consider it in any way, shape, or form in your deliberations."

Again, although the HPD detectives testified that they eliminated Muna as a suspect based, in part, on their review of Chinatown surveillance footage, the footage itself was not admitted into evidence and the circuit court specifically prohibited the State from eliciting testimony regarding its content.  Therefore, the DPA's comment was clearly improper.  This statement poses a heightened danger of prejudice to Pasene's defense, given the fact that the DPA similarly invoked the content of the Chinatown surveillance footage in the State's opening statement and implied that it directly contradicted Pasene's mistaken identity defense.  Thus, even though the circuit court promptly issued a curative instruction, the repeat nature of the DPA's improper conduct and its centrality to Pasene's defense raise concerns about the cumulative effect of such conduct.  See Pemberton, 71 Haw. at 476, 796 P.2d at 85.

### iii.  Taxi Driver Identification

The DPA also stated, "[w]ho else IDs Mr. Pasene? Darren [Kawelolani,] the taxi driver."  Defense counsel objected

65

on the grounds that "Kawelolani never identified Mr. Pasene."

Kawelolani testified that he picked up two passengers in his taxi cab and saw a male drive by in a blue Buick shortly before he heard gunshots.  He later saw someone on the news and thought "that's the person that . . . passed me."  Muna testified that he got into a taxi cab at the same time and place, and saw Pasene drive by in the blue Buick.  Thus, if the jury found both Kawelolani and Muna's testimony to be credible, an inference could be drawn that Pasene was the person that Kawelolani saw driving the blue Buick.  The jurors were not left to make this assessment, however, as the DPA made it for them.

The circuit court overruled defense counsel's objection to the statement and denied defense counsel's request for a curative instruction.[17]  It asked the DPA to clarify his statement, which he did by accurately representing the evidence and explaining the inferences that could be drawn therefrom.  However, neither the DPA or the circuit court communicated to the jury that the DPA's original assertion - that Kawelolani identified Pasene as the driver - was untrue.

The DPA's statement was improper, as Kawelolani did not

---

[17]    This court has held that overruling an objection can in effect endorse the prosecutor's remarks.  See State v. Espiritu, 117 Hawaiʻi 127, 143, 176 P.3d 885, 901 (2008) (Because defense counsel's objections to prosecutor's misstatement during closing argument were overruled, "the jury would reasonably perceive that the misstatement of the law was not incorrect."); State v. Schnabel, 127 Hawaiʻi 432, 453, 279 P.3d 1237, 1258 (2012) ("[B]y overruling defense counsel's objection, the court, at least tacitly, placed its imprimatur upon the [prosecutor's] improper remarks.") (citation, internal quotation marks and original brackets omitted).

directly identify Pasene as the driver of the blue Buick. Moreover, the DPA's statement was prejudicial to Pasene's defense. Sakaria and Tagataese had been friends with Peneueta for over 20 years and Pasene was the last remaining defendant being prosecuted for Peneueta's killing. In his closing argument, defense counsel questioned Sakaria and Tagataese's credibility by suggesting that they wanted to facilitate Pasene's conviction in order to ensure someone would be held accountable for Peneueta's killing. Kawelolani, however, appears to be a disinterested third party witness without direct ties to Peneueta, Pasene, or Muna. Thus, by implying that Kawelolani directly corroborated the eye-witness identifications made by Sakaria and Tagataese, the DPA's statement strengthened the State's case against Pasene.

Because the circuit court overruled defense counsel's objection and did not issue a curative instruction, the prejudicial effect of the DPA's statement was not sufficiently addressed by the circuit court.

### iv. Asking the Jury to Place Themselves in the Shoes of Eye-Witnesses

Defense counsel objected to the DPA's discussion of Sakaria and Tagataese's testimony, arguing that the DPA improperly asked the jury to place themselves in the shoes of the witnesses in assessing their credibility. The circuit court did not sustain or overrule the objection, but asked the DPA to

rephrase.

The DPA then stated:

> Imagine a person has a friend for over 20 years and .
> . . two guys jump out, and they shoot him in his back
> and kill him and that's <u>your</u> good friend. . . .  <u>You</u>,
> as a friend, would want the person who shot <u>your</u> close
> friend to be held and come to justice, so you're going
> to tell the truth if <u>you're</u> a friend and he was a
> friend for over 20 years.

(Emphases added).

Defense counsel did not object and the statement went unaddressed by the circuit court.  Pasene now argues the DPA's statement was an improper attempt to elicit the jury's sympathy and passion.  However, in context, the DPA's statements entreated the jury to use their life experiences to judge the credibility of the witness' testimony, rather than asking the jury to put themselves in the witnesses' position.  Unlike in <u>Rogan</u>, the DPA's invitation to consider the perspective of the witnesses was not accompanied by a "blatantly improper" plea for sympathy.  <u>Cf.</u> 91 Hawai'i at 414, 984 P.2d at 1240 (prosecutorial misconduct warranted reversal of a conviction where the prosecutor made a "blatantly improper plea to evoke sympathy for the Complainant's mother and represented an implied invitation to the jury to put themselves in her position.").  Thus, the DPA's statement was not improper.

> **d.   The State's Rebuttal Closing**

In his closing argument, defense counsel stressed the presumption of innocence and emphasized that the question before

the jury was whether the State proved beyond a reasonable doubt that Pasene killed Peneueta. Defense counsel then highlighted evidence suggesting Muna, rather than Pasene, may have been one of Peneueta's killers. Defense counsel submitted to the jury that this evidence showed the State had failed to carry its burden of proof.

The DPA opened the State's rebuttal closing by stating, "[defense counsel] had this nice drawing of presumption of innocence, blah, blah, blah, right, it's our burden, and we're over here and he draws a stick man." The circuit court overruled defense counsel's objection to the DPA's "blah, blah, blah" comment, effectively endorsing it, rather than issuing a curative instruction.[18]

A prosecutor's comment is clearly misconduct where it "constitute[s] an impermissible attack on defense counsel's integrity" and "operate[s] to denigrate the legal profession in general." Klinge, 92 Hawai'i at 595, 994 P.2d at 527. Moreover, the presumption of innocence and the State's burden of proving every material element of the offenses charged beyond a reasonable doubt are fundamental protections under our constitution that were central to Pasene's mistaken identity defense.

In mocking defense counsel's portrayal of these

---

[18]    See supra, note 17.

fundamental principles, not only did the DPA denigrate defense counsel and the legal profession in general, he also improperly denigrated the constitutional protections that were at the heart of Pasene's defense. Because the circuit court overruled defense counsel's objection to the DPA's statement, it failed to issue a curative instruction sufficient to overcome the prejudicial nature of the improper conduct.

The DPA also stated, "John Gotti, when he goes to trial, he's presumed innocent. Charles [Manson] . . . ." The court sustained defense counsel's objection and instructed the jury to "disregard the last statements of the prosecutor."

We have recognized that prosecutors "should not use arguments calculated to inflame the passions or prejudices of the jury[,]" as "[a]rguments that rely on . . . prejudices of the jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated." Rogan, 91 Hawaiʻi at 413, 984 P.2d at 1239 (quoting ABA Prosecution Function Standard 3-5.8(c) (3d ed. 1993) and the 1979 commentary to that section) (internal quotation marks omitted). While it cannot be said that the DPA's statement was calculated to inflame the passions or prejudices of the jury, that was likely the result. As the circuit court acknowledged, referencing such notorious examples of heinous murderers during the State's rebuttal closing in a murder trial may lead the jury to react based on emotion, rather than in an objective way, and threatens to introduce "an

70

atmosphere of bias and prejudice" as the jury enters
deliberation.  Kahalewai, 55 Haw. at 129, 516 P.2d at 338.  Thus,
although the circuit court promptly issued a curative
instruction, it may not have sufficiently negated the prejudicial
impact of the DPA's statement.

> ### e.    Conclusion

In conclusion, with regard to the first factor in our
analysis of prosecutorial misconduct, we find the nature of the
DPA's improper conduct weighs heavily in favor of vacating
Pasene's convictions.  As an officer of the court, the prosecutor
is expected to know and abide by the standards of professional
conduct, to operate in accordance with the interests of justice,
and to act with due regard for fairness and the rights of the
defendant.  Standards 3-1.2 and 3-1.9, ABA Standards for Criminal
Justice (4th ed. 2015).  Attempts to refer to evidence that has
been specifically excluded by the circuit court, and to denigrate
core constitutional protections such as the presumption of
innocence, undermine the integrity of the criminal justice
system.  Moreover, the repetitive nature of the DPA's improper
conduct, despite multiple warnings and admonishments from the
circuit court, raises the question of whether this pattern of
behavior was purposeful.

With regard to the second factor in our analysis of
prosecutorial misconduct, in response to the DPA's improper
conduct, the circuit court properly sustained the majority of

defense counsel's objections and generally issued curative instructions to the jury where necessary.  However, there were occasions where defense counsel failed to object, the circuit court overruled defense counsel's objections, or the circuit court failed to issue necessary curative instructions.  Several of those instances involved improper conduct that directly impacted Pasene's theory of defense.  As such, because it cannot be said that the circuit court's efforts were sufficient to eliminate the cumulative prejudicial effect of the conduct, this factor also weighs in favor of vacating the convictions. Pemberton, 71 Haw. at 476, 796 P.2d at 85.

**2.    Strength or Weakness of the Evidence Against Pasene**

The State's evidence against Pasene included testimony from Sakaria and Tagataese, who identified Pasene as the driver of the blue Buick sedan and one of Peneueta's killers.  The State also presented Officer Le's testimony that Pasene used the Phone and the blue Buick sedan in the weeks leading up to Peneueta's killing, in conjunction with the cell phone site records purporting to show the Phone, and therefore Pasene, was in Chinatown around the time of Peneueta's killing, and in Wahiawā at around the time the blue Buick sedan was reported burning. The State also elicited testimony from detectives McCormick and Coons regarding their investigation of the shooting and the factors that led them to eliminate Muna as a suspect.

To support his mistaken identity defense, Pasene

presented evidence that Muna, rather than Pasene, may have been one of Peneueta's killers.  Muna generally resembled Pasene in dress and appearance, and was, even by his own account, in the general vicinity of Peneueta's killing around the time it occurred.  Moreover, the blue Buick sedan was previously registered to Muna, and Pasene testified that he borrowed the car from Muna prior to Peneueta's killing.  In addition, Muna's bail bond agent, Del Rio, testified that on the day of Peneueta's shooting, Muna admitted that he "shot someone," and that he tried to use the blue Buick as collateral just one day prior.

Although the evidence supporting Pasene's convictions was strong, it cannot be said that the DPA's improper comments did not contribute to the jury's determination of guilt.  In reaching this conclusion, we note that two prior trials ended in mistrials when the juries were unable to reach unanimous verdicts.  Because there is a reasonable possibility that the DPA's improper statements might have contributed to Pasene's convictions, the statements cannot be said to be harmless beyond a reasonable doubt.  Thus, in denying Pasene's post-trial motion for mistrial or new trial, the circuit court clearly disregarded principles of law to Pasene's substantial detriment.  As such, Pasene's convictions must be vacated.

### III.  CONCLUSION

For the reasons set forth herein, we vacate the ICA's Judgment on Appeal and the circuit court's Amended Judgment of

73

Conviction and Sentence, and remand the case to the circuit court for further proceedings consistent with this opinion.

Thomas M. Otake
for petitioner

Brian R. Vincent
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Matthew J. Viola

